**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

DR. BRIAN K. MITCHELL                                                    PLAINTIFF

v.                                        Case No. 4:21-cv-917-JM

DR. CHRISTINA DRALE,
*in her individual and official capacities*;
DR. SARAH BETH ESTES,
*in her individual capacity*;
DR. JESS PORTER,
*in his individual capacity*; and
DR. BELINDA BLEVINS-KNABE,
*in her individual capacity*                                          DEFENDANTS

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

UNIVERSITY OF ARKANSAS SYSTEM
OFFICE OF THE GENERAL COUNSEL

David A. Curran (Ark. Bar No. 2003031)
Associate General Counsel
University of Arkansas System
2404 N. University Ave.
Little Rock, AR  72207-3608
(501) 686-2536
dcurran@uasys.edu

And

Mindy D. Pipkin (Ark. Bar No. 2004067)
Associate General Counsel
University of Arkansas System
2801 S. University Ave., SSC Suite 413
Little Rock, AR  72204-1099
(501) 916-5699
mdpipkin@ualr.edu

*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION......................................................................................7

STANDARD FOR DISMISSAL...............................................................11

ARGUMENT..........................................................................................13

I.      Dr. Mitchell has not alleged facts giving rise to a plausible claim of
        disparate treatment based on race or national-origin under Section 1981,
        Title VII, and ACRA (claims 2, 5, 6, and 10)...........................................13

        A.      Incident 1: Corrected Pay Disparity................................................14

                1.      Dr Mitchell admits that he was not similarly
                        situated to Dr. Heil...........................................................14

                2.      A corrected pay disparity is not an adverse action.....................14

                3.      Public records of undisputed authenticity show that
                        UA Little Rock has paid the two history professors
                        hired in summer 2015 the same salaries since late
                        2017..................................................................................19

                4.      Dr. Mitchell is not similarly situated to more recent hires,
                        so he cannot assert a plausible claim over recruiting
                        incentives..........................................................................20

                5.      Dr. Mitchell's wage claim is barred by Section 1981's
                        statute of limitations.........................................................21

        B.      Incident 2: Performance Evaluations...............................................25

                1.      Dr. Mitchell has always received a score of "satisfactory"
                        or higher on his performance evaluations...............................25

                2.      Dr. Mitchell's information-and-belief allegations do not give
                        rise to an inference of disparate treatment in evaluations.........30

                3.      Dr. Mitchell has not suffered an adverse action with
                        respect to his evaluations....................................................32

C.      Incident 3: Memorandum of Understanding.........................…......35

    1.      Dr. Mitchell has not alleged that a similarly situated
history professor secured an MOU on pre-tenure
requirements................................................................…....35

    2.      UA Little Rock's refusal to enter into an MOU with
Dr. Mitchell was not an adverse action..............................…....35

D.      Incident 4:  Grievance Policies and Procedures..............................35

    1.      Dr. Mitchell's allegations boil down to a failure to make
an exception to UA Little Rock's usual grievance procedures.....35

    2.      Dr. Mitchell does not allege that UA Little Rock has allowed
similarly situated persons to bypass its ordinary grievance
process........................................................................37

    3.      The complaint does not allege an adverse action in
connection with the grievance proceedings..............................38

E.      Incident 5: "Spoliation".................................................................38

    1.      Dr. Mitchell does not have a private cause of action to enforce
Title VII's recordkeeping requirements..............................…....39

    2.      UA Little Rock's non-retention of "score sheets" cannot be
discriminatory if similarly situated persons were treated
the same way................................................................39

    3.      Dr. Mitchell's allegations regarding pay-correction records
do not support an inference of a racial motive.........................40

    4.      UA Little Rock's alleged non-retention and non-creation
of records were not adverse actions......................................41

F.      Incident 6: IRB Proceedings.........................................................41

    1.      The Role of Institutional Review Boards..............................41

    2.      UA Little Rock's IRB Policies and Procedures.......................42

    3.      Dr. Mitchell's IRB-Related Allegations and Exhibits...............45

4.      Dr. Mitchell does not have a private cause of action
to enforce OHRP's regulations, and his IRB-related
critiques are misguided and distracting.................................48

5.      Dr. Mitchell's IRB-related claim of discrimination is
implausible because he has not alleged that anyone made
Dr. Blevins-Knabe aware of similar projects.........................51

6.      Dr. Mitchell did not suffer an adverse action as a result
of the IRB proceedings......................................................53

II.     Dr. Mitchell's retaliation claims under Section 1981 and Title VII
are implausible (claim 8)..........................................................54

A.      Dr. Mitchell was not subjected to a materially adverse action...........55

B.      Dr. Mitchell has not alleged a causal link between a protected
activity and an adverse action.......................................59

1.      Non-Creation of Additional Records on Pay
Correction...........................................................59

2.      Non-Retention of "Score Sheets"...........................................60

3.      Adherence to Grievance Policy..........................................61

4.      IRB Proceedings.................................................61

5.      Lawyer's Statement.............................................63

III.    Dr. Mitchell has not alleged facts giving rise to a plausible inference of
a racially hostile work environment under Section 1981 and Title VII
(claim 7).....................................................................64

IV.     Dr. Mitchell's constructive-discharge claim under Section 1981 and
Title VII is implausible (claim 9)........................................66

V.      Dr. Mitchell has not stated a plausible claim under the Fourteenth
Amendment's Due Process clause (claim 1)..............................69

A.      UA Little Rock's Grievance Policies and Procedures......................70

B.      IRB Proceedings.................................................73

C.      "Spoliation"………………………………………..……………………75

VI.    Dr. Mitchell's conspiracy claim under 42 U.S.C. § 1985 is implausible (claim 3)………………………………………………………………….…76

VII.   Dr. Mitchell's neglect claim under Section 1986 is untimely and implausible (claim 4)……………………………………………………….…77

A.      Section 1986's One-Year Statute of Limitations…………………………78

B.      Insufficient Conspiracy Allegations………………………………….…79

VIII.  Dr. Mitchell's Title VII claims are time-barred or unexhausted, except for his (implausible) claim regarding his outstanding February 2022 performance evaluation (claims 5, 6, 7, 8, and 9)……………………………79

A.      Dr. Mitchell has a timeliness problem under the 180-day requirement…………………………………………………………....80

B.      Dr. Mitchell has a timeliness problem under the 90-day requirement for matters within the scope of his first EEOC charge…………………………………………………..………81

C.      Several of Dr. Mitchell's Title VII claims are unexhausted…………..82

D.      Summary………………………………………………………………83

IX.    Dr. Mitchell's ACRA claims are barred by the statute of limitations (claim 10)………………………………………………………....83

X.     Title VII and ACRA do not authorize individual-capacity suits in the employment context (claims 5, 6, 7, 8, 9, and 10)……………………….…..84

XI.    Dr. Mitchell's ACRA claim against a public institution of higher education is barred by sovereign immunity (claim 10)…………………………84

XII.   The individual-capacity defendants have qualified immunity and statutory immunity……………………………………………………....85

A.      Qualified Immunity……………………………………………………85

1.      Jess Porter is entitled to qualified immunity…………………….88

2.    Sarah Beth Estes is entitled to qualified immunity……….........94

3.    Christina Drale is entitled to qualified immunity……….……96

4.    Belinda Blevins-Knabe is entitled to qualified immunity……...99

B.    Statutory Immunity……………………………………….......102

XIII.  Dr. Mitchell's claim for injunctive relief is moot and impermissibly
vague………………………………………………………..……103

XIV.  The amended complaint violates Rule 8's requirement of a short and
plain statement…………………………………………………,,…103

CONCLUSION………………………………………………..……105

## INTRODUCTION

Plaintiff Brian Mitchell is an African American who, until recently, served as an associate professor of history at the University of Arkansas at Little Rock. In his amended complaint (ECF 50), Dr. Mitchell accuses four individuals—Chancellor Christina Drale, Dean Sarah Beth Estes, Dr. Jess Porter, and Dr. Belinda Blevins-Knabe—of racial and national-origin discrimination,[1] racial harassment, constructive discharge, retaliation, conspiracy, failure to prevent a conspiracy, and due-process violations. But his 96-page complaint consists of "a scattered assortment of actions that are either petty, unsubstantiated, or otherwise causally unrelated" to any protected conduct or racial classification. *Forcello v. County of Ramsey*, 612 F.3d 1069, 1084 (8th Cir. 2010). The claims are implausible on their face under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and this Court should dismiss them.

Consider, for example, Dr. Mitchell's claims of disparate treatment and racial harassment. Dr. Mitchell does not contend that he has been subjected to racial slurs or physical threats. Nor has he been subjected to a materially adverse employment action such as a suspension, demotion, or termination pursuant to UA Little Rock's dismissal policies. To the contrary, Dr. Mitchell's annual evaluations have been filled with praise, and he has never received an unsatisfactory review while serving as a full-time faculty member. In fact, a few weeks before he filed suit, Dr. Mitchell was

---

[1] Defendants use the term "race" and "national origin" interchangeably, consistent with Dr. Mitchell's practice. *See* ECF 50, ¶ 111 (alleging discrimination based on Dr. Mitchell's "national origin" as an "African American").

awarded tenure, promoted, and given a raise that boosted his compensation above a white colleague who obtained tenure many years earlier.[2]

Dr. Mitchell's time at UA Little Rock has not been without frustration. No workplace is perfect. UA Little Rock acknowledges, for instance, that it paid a slightly higher salary to a history professor who received a tenure-track appointment around the same time as Dr. Mitchell. But the complaint's exhibits and public records conclusively show that UA Little Rock rectified the pay disparity a long time ago (and well before any suit).[3] The anti-discrimination laws encourage—rather than punish— such self-correcting actions.

UA Little Rock also concedes that it declined to create special rules for Dr. Mitchell in various contexts, but that way of operating is the *opposite* of discrimination. For example, Dr. Mitchell did not get to bypass the publication requirements that have haunted every tenure-track professor for a century, and he did not get to convene a special forum on racial inequality with high-level administrators rather than using the regular grievance process. UA Little Rock's decisions to adhere to generally applicable policies had nothing to do with Dr. Michell's race, and they did not negatively alter the terms and conditions of his employment. Dr. Mitchell's contrary

---

[2] *See* UA Little Rock press release, "Faculty Distinction: Promotion and Tenure 2021," *available at* https://ualr.edu/provost/promotion-and-tenure-announcements/.

[3] Dr. Mitchell and Dr. Michael Heil, who were hired under different provosts, joined UA Little Rock as full-time, tenure-track assistant professors prior to the 2015-2016 academic year. ECF 50, ¶ 10. Dr. Mitchell previously served as a part-time, adjunct professor. UA Little Rock does not give "credit" for years of part-time employment when determining salaries or the duration of an assistant professor's probationary period (*i.e.*, "tenure clock"), and Dr. Mitchell does not allege otherwise.

understanding of the law—and his misguided belief that making this point in an earlier legal brief gives rise to a new, actionable claim of discrimination against the individual defendants—underscores the implausibility of his claims. *See, e.g.*, ECF 50, ¶ 215 (complaining that "court pleadings" have "disparagingly" described Dr. Mitchell as "seeking special access").

These and related problems that existed at the inception of this lawsuit continue to linger, and new problems have emerged. At the time that Dr. Mitchell commenced this litigation (ECF 1) in October 2021, he was unable to demonstrate an "adverse action"—an essential element under the employment laws. ECF 10, at 6. This pleading deficiency remains, despite Dr. Mitchell's contrived attempts to point at an adverse action. He recently accepted a new job[4] as Director of Research and Interpretation at the Abraham Lincoln Presidential Library and Museum in Springfield, Illinois,[5] and he now seeks to use this factual development as means of overcoming his earlier obstacle. A "constructive discharge," after all, qualifies as an adverse action. He says that his February 2022 performance evaluation was a central

---

[4] *See* Press Release, Reconstruction Expert Named New Head of Research at Lincoln Presidential Library and Museum (June 28, 2022), *available at* https://presidentlincoln.illinois.gov/News/60/Reconstruction-expert-named-new-head-of-research-at-Lincoln-Presidential-Library-and-Museum/news-detail/.

[5] At the motion-to-dismiss stage, a court may consider matters of judicial notice under Rule 201 of the Federal Rules of Evidence. The rule allows courts to take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Bauer v. AGA Service Co.*, 25 F.4th 487 (8th Cir. 2022) (taking judicial notice, at the motion-to-dismiss stage, of information contained on the World Health Organization's website).

catalyst for his resignation. But Dr. Mitchell's peers on the history department's Appointment, Promotion, and Tenure (APT) Committee assigned an "outstanding" overall score to Dr. Mitchell, and the history department's former chairperson, Dr. Porter, revised the evaluation to reflect an even higher score after Dr. Mitchell expressed dissatisfaction. Dr. Mitchell also says that he was upset by the undersigned counsel's statements at a legislative hearing on January 27, 2022. But counsel merely expressed surprise at the fact that Dr. Mitchell would sue his employer within a few weeks after getting tenure, a promotion, and a raise; counsel was under no legal obligation to give legislators a detailed oral account of Dr. Mitchell's voluminous pleadings.

Dr. Mitchell's experiences are "certainly not the stuff of constructive discharges." *Bozeman v. Arkansas Foundation for Medical Care*, No. 4:18-cv-00904-LPR, 2020 WL 3512084, at 18 (E.D. Ark. 2020). "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Suarez v. Pueblo Itern., Inc.*, 229 F.3d 49, 54 (1st Cir. 2000).

Dr. Mitchell's claims suffer from numerous other defects, too. For example, his compensation-related claim under 42 U.S.C. § 1981 is largely time-barred, as are his claims under Title VII, ACRA, and 42 U.S.C. § 1986. In addition, Title VII and ACRA do not authorize claims against natural persons. Certain claims are also barred by the doctrines of sovereign immunity, qualified immunity, and statutory immunity.

Dr. Mitchell has also failed to allege facts that give rise to an inference of discrimination or retaliation. And his amended complaint, like the original complaint, fails to demonstrate that he has suffered a hostile work environment or an adverse action under the employment laws. The Court should dismiss this civil action with prejudice.

## STANDARD FOR DISMISSAL

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must allege enough factual content in the complaint to render the claim for relief "plausible on its face." *Twombly*, 550 U.S. at 570. The elements of a *prima facie* case "are not irrelevant to a plausibility determination in a discrimination suit" and "are part of the background against which a plausibility determination should be made." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016); *see also Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013) ("[T]he elements of a *prima facie* case may be used as a prism to shed light upon the plausibility of the claim.").

*Twombly* requires courts to consider "whether there are lawful, obvious alternative explanations" for the alleged conduct, because "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 945 (2009)). Moreover, it is not a district court's role to "conjure up unpled allegations to save a complaint" where, as here, the plaintiff has failed to plausibly allege an essential element. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

While the *Twombly* standard demands allegations of fact rather than legal conclusions, a long-winded complaint does not necessarily satisfy the standard. "Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, No. Civ. A. 01-10583, 2003 WL 21228001, at *9 (D. Mass. May 21, 2003). In this case, for instance, the operative complaint is thin on relevant facts and rich in legal jargon, citations to inapposite cases, speculation, conclusory assertions, and hyperbole. *See, e.g.*, ECF 50, ¶¶ 49, 328 (asserting that Dr. Mitchell's situation at UA Little Rock was indicative of "plantation and slavery culture"). If anything, the complaint's verbosity constitutes a pleading defect that weighs *in favor* of dismissal, not against it. *See, e.g.*, Fed. R. Civ. P. 8 (requiring the complaint to consist of a "short and plain statement of the claim" using "simple, concise, and direct" language).

At the motion-to-dismiss stage, a district court "is not limited to the four corners of the complaint." Charles A. Wright et al., *Federal Practice & Procedure* § 1357 (3d ed. April 2021 Update). Federal courts routinely consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Id.* "[T]hese items may be considered by the district judge without converting the motion to one for summary judgment." *Id.*; *see also Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Extra-pleading materials "embraced by the complaint"—that is, unattached documents "whose contents are alleged in a complaint and whose authenticity no party

questions"—may also be considered on a motion to dismiss. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012); *see also Minnesota Majority v. Mansky*, 708 F.3d 1051, 1056 (8th Cir. 2013) (holding that the district court properly considered an unquestionably authentic policy that the parties mentioned in legal filings). Even if such documents contradict the allegations in the complaint, a court may consider them without converting a Rule 12(b)(6) motion into one for summary judgment. *Zean v. Fairview Health Services*, 858 F.3d 520, 526-27 (8th Cir. 2017) (considering two exhibits that refuted the plaintiff's conclusory assertion that a contractual relationship existed).

## ARGUMENT

### I.    Dr. Mitchell has not alleged facts giving rise to a plausible claim of disparate treatment based on race or national origin under Section 1981, Title VII, and ACRA (claims 2, 5, 6, and 10).

Absent direct evidence of discrimination, courts apply the burden-shifting analysis set forth in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). To establish a *prima facie* case of discrimination, the plaintiff must show that (1) he is a member of a protected class; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) "similarly situated" employees outside of the plaintiff's protected class were treated differently. *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005). As noted above, the elements of a *prima facie* case provide critical "background" for the Court's plausibility analysis. *Blomker*, 831 F.3d at 1056.

Dr. Mitchell has not alleged sufficient facts in support of the third and fourth elements of a *prima facie* case. For one thing, he has not alleged facts demonstrating that he suffered an adverse employment action—that is, a material change in employment conditions. *See Clegg v. Arkansas Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) ("An adverse action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects."); *see also Johnson v. Viskase*, No. 3:10CV00304 SWW, 2011 WL 13195907, at *2 (E.D. Ark. Oct. 27, 2011), *aff'd*, 457 F. App'x 594 (8th Cir. 2012) (dismissing a complaint that contained insufficient allegations of adverse action). Nor has Dr. Mitchell alleged facts showing that similarly situated employees were treated differently.

Dr. Mitchell's claims of race discrimination are based on six discrete incidents: (1) a pay disparity that UA Little Rock fixed in late 2017 and early 2018; (2) UA Little Rock's alleged refusal to enter into a memorandum of understanding with Dr. Mitchell regarding the use of "digital projects" to meet tenure requirements in December 2018; (3) Dr. Mitchell's annual performance evaluations; (4) UA Little Rock's alleged "spoliation" of pay-correction memoranda and evaluation scores; (5) UA Little Rock's alleged refusal to allow Dr. Mitchell to bypass the institution's ordinary grievance procedures when pursuing an internal complaint of racial discrimination in February 2019; and (6) the Institutional Review Board's finding of noncompliance against Dr. Mitchell in February 2020. Each of the six incidents will be addressed below.

A.    **Incident 1: Corrected Pay Disparity**

1.    **Dr Mitchell admits that he was not similarly situated to Dr. Heil.**

Dr. Mitchell alleges that, when he was hired as a full-time faculty member in summer 2015, he was paid less than a white individual who was "hired at the same time." ECF 50, ¶ 21. Dr. Mitchell has identified the comparator as Dr. Michael Heil. ECF 50, ¶¶ 50, 60, 64.[6] Dr. Mitchell admits that Dr. Heil held a degree from an Ivy League university, whereas Dr. Mitchell did not. ECF 50, ¶¶ 21, 27, 41. Therefore, Dr. Mitchell and Dr. Heil were not similarly situated in all relevant respects. *Lee v. Mid-State Land & Timber Co.*, 285 Fed. Appx. 601, 606 (11th Cir. 2008) (holding that the plaintiff failed to establish a *prima facie* case of wage discrimination due to "differences in education").

2.    **A corrected pay disparity is not an adverse action.**

The amended complaint's allegations, exhibits, and undisputed facts of public record show that Dr. Mitchell has not suffered an adverse action because UA Little Rock fixed the pay disparity a long time ago. An "adverse action" has not been suffered in the area of compensation if the impact on an employee's pay has been cured by an internal process. *See Jackson v. United Parcel Services, Inc.*, 548 F.3d 1137, 1142 (8th Cir. 2008) (holding that a claim was not actionable where the employee was reinstated with full backpay and seniority); *Harston v. Chappell*, No. 2:07CV00142 SWW, 2009 WL 252290, at *5 (E.D. Ark. Jan. 30, 2009) (rejecting a claim that an employee suffered an adverse action because the employee's salary was corrected and

---

[6]Dr. Heil's faculty profile is available at https://ualr.edu/history/michael-heil/.

he received compensation). If the rule were otherwise, "there would be absolutely no incentive for employers to make adjustments for past conduct." *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003) (holding that "an employer may cure an adverse employment action" and thereby preclude the imposition of liability).

At UA Little Rock, faculty members with nine-month appointments (such as Dr. Mitchell, Dr. Heil, and most other faculty members without administrative positions) are compensated over eighteen pay periods[7] within an "academic year"—a schedule of bimonthly payments that runs from approximately August 31 to May 15 of the following year. The publicly available records on UA Little Rock's Open Checkbook website[8] show that, on December 29, 2017, Dr. Mitchell received a payment of $3,400.27, which represented an increase in Dr. Mitchell's salary from $2,888.89 to $3,045.61 per pay period (*i.e.*, $54,821 per year—the same as Dr. Heil), plus $354.66. *See* ECF 53-1, at 3. The latter sum represented backpay for the paychecks previously issued on November 15, November 30, and December 14, 2017. Later, on March 15, 2018, Dr. Mitchell received $7,764.72, which reflected Dr. Mitchell's new rate of pay

---

[7] Faculty members can also choose to teach summer courses for additional compensation, which is calculated as a percentage of their base salaries. *See* Policy 403.24 ("Summer Teaching"), *available at* https://ualr.edu/policy/home/facstaff/summer-teaching/.

[8] The Open Checkbook website, as mandated by Ark. Code Ann. § 6-61-135, is publicly available at https://a.ualr.edu/expenditures/. The Open Checkbook records for the faculty members discussed in this brief—namely, Brian Mitchell, Michael Heil, Andrew Amstutz, David Baylis, Nathan Marvin, Katrina Yeaw, and James Ross—are attached to Defendants' motion to dismiss as Exhibits 1-7 (ECF 53-1 through ECF 53-7). These records begin with the 2012-2013 fiscal year and end with the 2019-2020 fiscal year.

(*i.e.*, $3,045.61 per pay period) plus $4,719.11. The latter sum represented the remaining amount of backpay needed to equalize Dr. Mitchell's and Dr. Heil's pay since they joined UA Little Rock's full-time faculty ranks before the start of the 2015-2016 academic year.[9]

Public records are not the only source of compensation information. Dr. Mitchell's own pleading shows that UA Little Rock equalized Dr. Mitchell's salary with Dr. Heil's salary and compensated Dr. Mitchell with backpay in late 2017 and early 2018. ECF 50, ¶¶ 27, 29 (admitting that UA Little Rock equalized their salaries and compensated him with backpay in late 2017 and early 2018); *see also* ECF 50-1, at 5 (Am. Compl. Ex. 4) (administrative memorandum on salary increase); ECF 50-1, at 6 (Am. Compl. Ex. 5) (administrative record of backpay).

Dr. Mitchell suggests in a conclusory fashion that he is still owed $200 (*see* ECF 50, ¶ 36), but he has not alleged any facts—such as mathematical calculation based on wage records—that support his allegation. (The publicly available wage rec-

---

[9] As the exhibits to Dr. Mitchell's complaint demonstrate, administrators at UA Little Rock changed their minds on the extent to which Dr. Mitchell should receive backpay, and they eventually decided to make the payments retroactive to Dr. Mitchell's hire date. ECF 50-1, at 5-6 (Am. Compl. Ex. 4 & 5). Dr. Mitchell previously received backpay for three pay periods during the 2017-2018 academic year, which left five periods in the academic year for which he had not received backpay. In other words, he needed to receive **$591.10** (*i.e.*, 5 x $118.22) to eliminate the disparity with Dr. Heil for that year. During the 2016-2017 academic year, the disparity with Dr. Heil was also $118.22 per pay period, or **$2,127.96** after calculating the difference over eighteen pay periods. For the 2015-2016 academic year, the disparity with Dr. Heil was $111.11 per pay period because they had slightly lower salaries. When applied over eighteen pay periods, Dr. Mitchell needed **$1,999.98** to fix the disparity in that academic year. When the amounts in bold typeface are added, the total amount needed to equalize Dr. Mitchell and Dr. Heil's pay retroactively was $4,719.04. Thus, Dr. Mitchell apparently received an overpayment of seven cents.

ords show no such miscalculation). Nor has Dr. Mitchell alleged that he ever approached UA Little Rock's administrators to discuss this alleged deficiency, so the notion that anyone withheld $200 due to discriminatory or retaliatory animus (as opposed to an innocent mistake) is implausible. In any event, withholding this *de minimis* amount would not constitute an adverse action as a matter of law. *Embry v. Callahan Eye Foundation Hospital*, 147 Fed. Appx. 819 (11th Cir. 2005) (holding that a suspension resulting in $88.73 in lost compensation was not an adverse action); *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997) (holding that an allegedly discriminatory recommendation regarding a faculty member's raise was not an adverse action because the variations among faculty members "were not significant"); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) (holding that a discretionary denial of a $600 bonus was not materially adverse action); *Arafi v. Mandarin Oriental*, 867 F.Supp.2d 66, 72 (D.D.C. 2012) (holding that a claim based on an inability to earn more tips for valet dry cleaning was based on "a de minimis amount, the deprivation of which cannot rise to the level of an adverse employment action"); *Dickerson v. SecTek, Inc.*, 238 F.Supp.2d 66, 76 n.4 (D.D.C. 2002) (concluding that the difference between one day's regular pay and one day's overtime pay "could well be described as a de minimis loss of pay" and therefore not actionable under Title VII); *Brooks v. Clinton*, 841 F.Supp.2d 287, 2301 (D.D.C. 2012) (holding that a failure to reimburse $70 taxi fare was not an adverse action).

3.     **Public records of undisputed authenticity show that UA Little Rock has paid the two history professors hired in summery 2015 the same salaries since late 2017.**

Dr. Mitchell also makes vague and conclusory allegations that "financial disparities continue to exist." ECF 20, ¶ 37. But *Twombly* demands greater precision—particularly where public records can readily illuminate the situation.[10] The public records show that, of the thirteen faculty members in the history department during Dr. Mitchell's employment, Dr. Mitchell got paid more than at least four individuals and the same as Dr. Heil, the only faculty member who received a full-time appointment around the same time as Dr. Mitchell.

| Academic / Fiscal Year | Brian Mitchell | Michael Heil | Andrew Amstutz, David Baylis, Nathan Marvin & Katrina Yeaw | James Ross |
|---|---|---|---|---|
| **2021-2022** | $57,621 (raise for promotion to associate professor) | $57,621 (raise for promotion to associate professor) | $54,000 | $56,365 |
| **2020-2021** | $54,821 | $54,821 | $54,000 | $56,365 |
| **2019-2020** | $54,821 | $54,821 | $54,000 | $56,365 |
| **2018-2019** | $54,821 | $54,821 | $54,000 | $56,365 |
| **2017-2018** | $54,821 (changed from $52,693; backpay issued for prior years) | $54,821 | *Not Full-Time Equivalent Employees (FTEs)* | $56,365 |
| **2016-2017**[11] | $52,693 (merit raise) | $54,821 (merit raise) | *Not FTEs* | $56,356 (merit raise) |
| **2015-2016** | $52,000 | $54,000 | *Not FTEs* | $55,672 |

[10] In addition to Open Checkbook records, salary information can be found in the operating budgets posted on the Arkansas Department of Higher Education's website, available at https://adhe.edu/institutions/annual-operating-budgets. The relevant pages of UA Little Rock's operating budgets since the 2013-2014 academic year are attached to Defendants' motion to dismiss as ECF 53-9 through ECF 53-17.

[11] The compensation records show that the summer before the 2016-2017 academic year was the only time that merit raises have been awarded during Dr. Mitchell's employment as a full-time professor at UA Little Rock.

| 2014-2015 | *Not an FTE* | *Not an FTE* | *Not FTEs* | $55,672 (merit raise) |
| 2013-2014 | *Not an FTE* | *Not an FTE* | *Not FTEs* | $54,658 (merit raise) |
| 2012-2013 | *Not an FTE* | *Not an FTE* | *Not FTEs* | $51,858 |

Dr. Mitchell does not allege that, after UA Little Rock's corrective actions in late 2017, a faculty member in the history department with the same or less seniority as Dr. Mitchell received a higher salary. In fact, due to a $2,800 raise that Dr. Mitchell and Dr. Heil received as part of their promotions to associate professor in summer 2021, they got higher salaries than a more senior member of the faculty (Dr. James Ross) during the most recent academic year.[12] The public records do not establish an ongoing pay disparity, and the amended complaint's conclusory allegations do not contradict this fact.

### 4. Dr. Mitchell is not similarly situated to more recent hires, so he cannot assert a plausible claim over recruiting incentives.

Dr. Mitchell also alleges that, "[s]ince 2015," new faculty members have received "incentives." ECF 50, ¶¶ 22. Dr. Mitchell is apparently referencing the start-up incentives—that is, funds for equipment and travel used to recruit new hires—that UA Little Rock provided to the four-person cohort that was hired prior to the 2018-2019 academic year. But Dr. Mitchell has not alleged any instance in which he was denied equipment or an appropriately documented request to travel for work.

---

[12] Dr. Ross is a white history professor who received his initial appointment and was awarded tenure several years before Dr. Mitchell and Dr. Heil. His faculty profile is available at https://ualr.edu/history/james-d-ross/.

Nor has he alleged that Dr. Heil, who started at the same time as Dr. Mitchell, received such incentives. The amended complaint is also devoid of any instances in which other senior faculty members have been eligible to receive incentives. Rather, Dr. Mitchell has merely alleged that *more recent hires* have received the start-up incentives.

More recent hires are not similarly situated to Dr. Mitchell. Employers are not obligated to make compensation adjustments for legacy employees every time they adopt a bonus or incentive program for the purpose of recruiting new employees. *See, e.g.*, *Milton v. Principi*, No. CIV.A. H-03-5837, 2005 WL 2561619, at *3 (S.D. Tex. Oct. 12, 2005) (holding that a plaintiff could not establish a *prima facie* case of discrimination because everyone who was already employed by the hospital, including the plaintiff, "was not eligible for a recruitment bonus when the new employees were hired"). Dr. Mitchell and Dr. Heil's ineligibility for recruiting incentives, based on their earlier start dates, is an obvious, nondiscriminatory explanation for the situation Dr. Mitchell has described.

### 5.   Dr. Mitchell's wage claim is barred by Section 1981's statute of limitations.

Dr. Mitchell's compensation-related claims under 42 U.S.C. § 1981 are barred or limited by a three-year or four-year statute of limitations. As an initial matter, the length of the limitations period must be determined, which is no easy matter in this area of the law. Prior to 1991, the Supreme Court held that claims under Section 1981 needed to be based on "conduct at the initial formation of [a] contract and conduct

which impairs the right to enforce contract obligations through legal process." *Patterson v. McLean Credit Union*, 491 U.S. 164, 179-80 (1989). Given the absence of a limitations provision in the statute, federal courts in Arkansas borrowed from state law and applied a three-year limitations period. *See, e.g.*, *Martin v. Georgia-Pacific Corp.*, 568 F.2d 58, 62-63 (8th Cir. 1977).

In 1991, Congress amended Section 1981 to cover post-formation discriminatory acts. Publ. L. No. 102-166. And in the preceding year, Congress enacted 28 U.S.C. § 1658, which established a four-year statute of limitations for all claims arising under federal statutes enacted after December 1, 1990. Consequently, Section 1981 claims based on the 1991 amendments—that is, claims that concern post-formation issues—are subject to a four-year statute of limitations. *Jones v. RR. Donnelly & Sons Co.* 541 U.S. 369 (2004). Claims regarding formation-related issues, in contrast, continue to be governed by the three-year limitations period. Thus, when applying these principles to wage-related issues, "[c]ourts have observed that wage compensation claims arising from discrimination during the formation of a contractual relationship would have been actionable under the original provisions of § 1981 and are subject to the [limitations period borrowed from state law]." *Brown v. Joseph McCormick Const. Co.*, No. CIV.A. 14-27 ERIE, 2015 WL 1757646, at *6 (W.D. Pa. Apr. 17, 2015) (collecting cases).

A statute-of-limitations analysis in a wage case also requires a determination of when the limitations period began to run. In *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), the Court held that the statute of limitations commences for

22

a compensation-related claim of discrimination when the employer makes a discriminatory pay-setting decision. *Id.* at 621. A new limitations period does not commence when the employer issues subsequent paychecks based on a past discriminatory decision. *Id.* at 628. The Court distinguished discrete discriminatory acts, which give rise to a new violation, from the non-discriminatory effects of a past discriminatory act. The Court narrowly confined the "paycheck accrual rule," as set forth in *Bazemore v. Friday*, 478 U.S. 385 (1986), to situations in which a pay structure is discriminatory on its face.

In response to *Ledbetter*, Congress enacted the Fair Pay Act of 2009, Pub. L. No. 111-2, § 2, 123 Stat. 5 (2009), which amended Title VII and certain other anti-discrimination statutes, such as the Rehabilitation Act, ADA, and ADEA. *See, e.g.*, 42 U.S.C. § 2000e-5(e)(3)(A) (stating that an unlawful discriminatory practice occurs "each time wages, benefits, or other compensation is paid" pursuant to an earlier discriminatory decision). The Fair Pay Act essentially codified the paycheck-accrual rule, whereby each paycheck that is issued pursuant to a discriminatory decision is a discrete discriminatory act that resets the applicable statute of limitations. But the Fair Pay Act does not mention Sections 1981, 1983, and 1985, and the Act's paycheck-accrual rule does not apply to claims under these statutes. *See Russell v. County of Nassau*, 696 F.Supp.2d 213, 230 (E.D.N.Y. 2010) (holding that claims under Sections 1981, 1983, and 1985 are governed by the Supreme Court's analysis in *Ledbetter* because the Fair Pay Act did not amend those statutes); *cf. Maher v. Int'l Paper Co.*, 600

F.Supp.2d 940 (W.D. Mich. 2009) (same holding for claims under the Family and Medical Leave Act).

Applying the foregoing principles to the present case, any claim that Dr. Mitchell might have asserted over his initial salary would need to have been commenced by summer 2018 (*i.e.*, three years after his initial appointment in 2015). Any claim that Dr. Mitchell might have asserted over his pay during the 2016-2017 academic year would need to have been brought, at the latest, by summer 2020 (*i.e.*, four years after the pay-setting decision). And any claim over Dr. Mitchell's pay during the 2017-2018 academic year would need to have been brought, at the latest, by summer 2021 (*i.e.*, four years after the pay-setting decision). Thus, any claims based on Dr. Mitchell's compensation prior to the 2018-2019 academic year are clearly time-barred.[13]

The public records show that Dr. Mitchell's salary has moved in lockstep with Dr. Heil's salary since spring 2017. Therefore, Dr. Mitchell has not alleged facts giving rise to an inference of pay discrimination for any period that might arguably be actionable under the statute of limitations.

---

[13] We do not mean to suggest that pay-setting decisions for the 2018-2019 academic year and thereafter are still actionable under Section 1981's statute of limitations. The public records show that there have been no merit raises since the 2016-2017 academic year, so the pay-setting decision that preceded the 2016-2017 academic year was the last salary-related action that could potentially be the subject of a discrimination lawsuit under Section 1981. Thus, all of Dr. Mitchell's salary-related claims are time-barred because he did not file this lawsuit prior to the limitations deadline in summer 2020. (As we explain later, his state-court action must be treated as if it was never filed; it does not save his time-barred claims.)

### B.     Incident 2: Performance Evaluations

#### 1.   Dr. Mitchell has always received a score of "satisfactory" or higher on his performance evaluations.

The history department's bylaws state that tenure-track faculty members "shall be rated annually in the separate categories of teaching, research, and service." *See* ECF 53-18, at 13-14. In keeping with the academic principles of peer review and shared governance, the bylaws delegate to the APT Committee the task of assigning a quantitative score to each faculty member. *Id.* at 5, 13-14.

The history department's bylaws establish various categories of performance. "Acceptable activity" in each category is given a "satisfactory" rating. *Id.* at 14. In other words, a "satisfactory" rating reflects a faculty member's appropriate level of teaching, research, and service. "Good" and "outstanding" ratings, according to the bylaws, are given to those activities that exceed "satisfactory." *Id.* "Publication" and "receipt of prestigious grants" are types of activities that might generate an above-satisfactory score in the area of research. "Well-above average teaching evaluations or successful innovations in teaching" can give rise to an above-satisfactory score in teaching. Finally, "Department, College, University, or discipline-related community leadership positions" can lead to an above-satisfactory score in service. A "substandard" rating, by contrast, "indicates that the individual's performance in that area has not met acceptable standards." *Id.*

The numerical scale in the bylaws was originally as follows: Substandard: 0 points; Satisfactory: 25 points; Good: 50 points; Outstanding: 75 points. In the event of a disagreement among members of the APT Committee, the points are averaged.

25

*Id.* at 23. In February 2013, the history department made some minor modifications to the categories and revised the point scale as follows: Satisfactory: 10 points; Good: 20 points; Outstanding: 30 points. *Id.* at 32. In February 2019, however, the APT Committee accidently reverted to the previous numerical scale for one year.

Dr. Mitchell's annual evaluations at UA Little Rock—each of which is a document embraced by the amended complaint at this procedural stage because Dr. Mitchell has made numerous allegations about them (and attached some of them to his pleading)—were as follows:

| Evaluation Date, Exhibit Reference | Evaluation Score | Comments |
|---|---|---|
| Feb. 2016, ECF 53-19 | Teaching: 10<br>Research: 10<br>Service: 10<br><br>The total score of 30 and average score of 10 were "satisfactory." | **APT Committee**: "Dr. Mitchell is making satisfactory progress toward tenure."<br><br>**Chair Hupp**: "Dr. Mitchell has expanded department course offerings and has done admirable service of the Core Curriculum Council." |
| Feb. 2017, ECF 53-20 | Teaching: 15<br>Research: 15<br>Service: 17.5<br><br>The total score of 47.5 and average score of 15.83 were above the mid-point between "good" and "satisfactory." | **APT Committee:** "Dr. Mitchell is making satisfactory progress toward tenure, but he is encouraged to continue to seek venues for publication of peer-reviewed articles related to his database work."<br><br>**Chair Porter:** "Dr. Mitchell has expanded department course offerings and has done admirable service on the Core Curriculum Council. I echo the APT Committee's suggestion regarding peer-reviewed publications. Because digital projects can be more difficult to assess, I encourage you to find traditional venues for publication to supplement the work you are completing in the digital realm." |
| Feb. 2018, ECF 53-21 | Teaching: 23.33<br>Research: 20<br>Service: 20<br><br>The total score of 63.33 and average score of 21.1 were above "good." | **APT Committee:** [summary of scores]<br><br>**Chair Porter:** "Dr. Mitchell continues to strengthen his portfolio for tenure and promotion. The Chair applauds the recent peer-reviewed publication and appreciates the community benefits of his |

| | | |
|---|---|---|
| | | contributions to the Encyclopedia of Arkansas and Culture. Dr. Mitchell is also to be commended for working in getting History students into the field and providing concrete experience in the realm of 'doing history.' Dr. Mitchell continues his university service with the Core Council." |
| Feb. 2019 (original), ECF 53-22 & ECF 50-1, at 8 (Am. Compl. Ex. 7)<br><br>Feb. 2019 (revised), ECF 53-23 & ECF 50-1, at 9 (Am. Compl. Ex. 8) | Teaching: 50<br>Research: 43.8<br>Service: 56.3<br><br>The total score of 150.1 and average score of 50.03 were, according to Dr. Mitchell, "at the lowest segment of the 'Good Category.'" ECF 50-1, at 10 (Am. Compl. Ex. 9). | **Summary (APT Committee and Dr. Porter):** ~~The committee and chair would remind Dr. Mitchell that the department requires one book published by an academic press or three articles published in a referred journal to be tenured and promoted to associate professor. It is unclear whether or not the book contract or the book chapter meet those criteria. We recommend that he make clearer how his work does so.~~ Dr. Mitchell has submitted, revised, and had approved a manuscript with the Historic New Orleans Collection with expected publication by early 2020. In conjunction with Dr. Mitchell's previously published book chapter and forthcoming book chapter, he has achieved the requisite number of publications for promotion and tenure defined in the bylaws. Meanwhile, Dr. Mitchell's flexibility regarding course scheduling is particularly appreciated. Dr. Mitchell's service portfolio is impressive and continues to grow. |
| Feb. 2020, ECF 53-24 | Teaching: 20<br>Research: 30<br>Service: 30<br><br>The total score of 80 and average score of 26.6 were above the midpoint between "good" and "outstanding." | **Summary (APT Committee and Dr. Porter):** "Dr. Mitchell contributes substantially to the mission of the Department and university. He has a strong research agenda, and he is very successful in disseminating his research in the public." |
| Feb. 2021, ECF 53-25 | Teaching: 20<br>Research: 30<br>Service: 30<br><br>The total score of 80 and average score of 26.6 were above the midpoint between "good" and "outstanding." | **Summary (APT Committee and Dr. Porter):** "Dr. Mitchell successfully adapted to the pandemic. He contributed substantially to the mission of the History Department and the university. Dr. Mitchell maintained an impressive research agenda, while remaining active in internal and external service." |
| | ***Awarded Tenure, Promoted to Associate Professor, and Given a Raise (effective July 1, 2022)*** | |

| Feb. 2022 (original), ECF 53-26<br><br>Feb. 2022 (revised), ECF 53-27 | Teaching: 23.75<br>Research: 30<br>Service: ~~23.75~~ 30<br><br>The original total of 77.5 and average score of 25.83 were above the midpoint between "good" and "outstanding." The revised score of 27.9 was even higher, reflecting Dr. Mitchell's highest score to date. | **Summary (ATP Committee and Dr. Porter):** "Dr. Mitchell contributed substantially to the mission of the History department and the University. He maintained a strong research agenda, while remaining active in internal and external research." |

Dr. Mitchell alleges that a few of the foregoing evaluations are evidence of intentional race discrimination. His concerns apparently began in 2017; even though his 2016 evaluation reflected the lowest score of his career as a full-time faculty member, he takes no issue with it. ECF 50, ¶ 50 (characterizing the 2016 evaluation, delivered by former chairperson Clea Hupp, as a "favorable review"). He also does not contend that the evaluations in 2020 and 2021 were problematic. With regard to the other evaluations, however, Dr. Mitchell contends that Dr. Porter and rotating members of the APT Committee subjected him to disappointing evaluations because of his race.

Dr. Mitchell first says that he received performance evaluations in 2017 and 2018 that encouraged him to organize his *curriculum vitae* differently and devote more energy to research. ECF 50, ¶¶ 51-53; *see also* ECF 53-20 through 51-21. But these statements, which do not even appear in the written evaluations, merely reflected advice intended to help Dr. Mitchell succeed. Moreover, the evaluation scores in these years were above the "satisfactory" level. There is nothing in the records from which a court can infer a racist plot to sabotage Dr. Mitchell's career.

Dr. Mitchell was particularly upset with his January/February 2019 evaluation of his work over the previous year. In his mind, it was too critical and reflected

an inadequate score. ECF 50, ¶ 76. But the comments were positive. ECF 50-1, at 8 (Am. Compl. Ex. 7) (initial 2019 evaluation) (praising Dr. Mitchell's "innovation in creating a class project," expressing gratitude for his "flexibility regarding course scheduling," and noting that his "service portfolio is impressive and continues to grow"). And Dr. Mitchell admits that the quantitative score fell within the "good" category. ECF 50-1, at 10 (Am. Compl. Ex. 9). Moreover, the history department's chairperson, Dr. Porter, changed a statement, at Dr. Mitchell's request, to reflect the fact that Dr. Mitchell's scholarship was sufficient to obtain tenure. ECF 50, ¶ 81; *id.* at 92; ECF 50-1, at 9 (Am. Compl. Ex. 8); ECF 53-23.

Dr. Mitchell also contends that one of the APT Committee's sub-scores on his February 2022 evaluation was too low because he got a "good" rating instead of an "outstanding" rating in the area of service. ECF 50, ¶ 191; ECF 53-26.[14] Such academic judgments are generally unsuitable for judicial review. *See Regents of Univ of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) ("If federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies, far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require an expert evaluation of cumulative information and

---

[14] The initial evaluation's *overall* score of 77.5 was "outstanding." Exhibit 30 to Dr. Mitchell's amended complaint (ECF 50-4, at 10) shows that Dr. Mitchell initially got a 23.75 for service, in addition to a score of 23.75 for teaching and 30 for research. Exhibit 30 further states that the scale was as follows: "10-Satisfactory, 20-Good, Outstanding-30." It makes sense that any overall score above 75 would have been closer to "outstanding" than "good."

are not readily adapted to the procedural tools of judicial or administrative deci-
sionmaking."). But they are uniquely suited for internal review by an academic ad-
ministrator with expertise in the area. On that score, Dr. Mitchell found a dependable
audience in Dr. Porter, the history department's chairperson, who listened to Dr.
Mitchell's concerns, met with the APT Committee, and ensured that Dr. Mitchell re-
ceived "the highest possible score" in the category of service. ECF 50-4, at 12 (Am.
Compl. Ex. 31). Dr. Porter summarized Dr. Mitchell's evaluation as follows:

> As you know, the History Department has not traditionally attached a
> category (*i.e.*, unsatisfactory, satisfactory, good, or outstanding) to an
> overall score. However, if such categories were assigned, it seems logical
> that the sum of the scores in teaching, service, and research of 75 would
> qualify as "outstanding." Therefore, your previous score of 77.5 [as as-
> signed APT Committee] would have qualified as "outstanding." After my
> change in your score for service, your new aggregate score of 83.75 is
> even higher. Thank you for bringing your concerns to my attention. I
> appreciate your contributions to the History department.

ECF 50-4, at 12 (Am. Compl. Ex. 31).

## 2. Dr. Mitchell's information-and-belief allegations do not give rise to an inference of disparate treatment in evaluations.

Dr. Mitchell speculates that Dr. Porter may have acted in concert with the
members of the APT Committee to give him lower evaluation scores than faculty
peers based on his race. Dr. Mitchell has relied entirely upon his "information and
belief" to support this contention. For example, Dr. Mitchell alleges—based solely
"upon information and belief"—that Dr. Heil's *curriculum vitae* was not characterized
as "unprofessional." ECF 50, ¶ 54. Dr. Mitchell further avers—based solely "upon

information and belief"—that "Professors Kirk, Mann, and Baylis" received evaluation points for "non-traditional scholarship." ECF 50, ¶ 68. He also speculates—based solely "upon information and belief"—that a court's review of faculty scores and job performance will reveal that his scores have been "inequitably low." ECF 50, ¶ 110.

These information-and-belief allegations do not create a plausible inference that Dr. Mitchell's evaluation scores have been discriminatorily calculated.[15] The plausibility standard under *Twombly* is not satisfied by allegations based on the plaintiff's "information and belief" because "[t]he mere fact that someone believes something to be true does not create a plausible inference that it is true." *In re Darvocet Products Liability Litigation*, 756 F.3d 917, 931 (6th Cir. 2014); *see also Lee v. Fed. Nat. Mortg. Ass'n*, 553 F. App'x 652, 654 (8th Cir. 2014) (holding that a claim based solely upon "information and belief" is "an example of the type of speculation . . . which we have held does not satisfy the requirements of Rule 8."); *Blantz v. California Dep't of Corr. & Rehab.*, 727 F.3d 917 (9th Cir. 2013) (holding that a lawsuit against a certain defendant was properly dismissed where the complaint alleged, based upon "information and belief," that the defendant directed other persons to take adverse actions).

---

[15] District courts within the Eighth Circuit have also concluded that, "[t]o survive a motion to dismiss, allegations in a complaint must not be based solely on 'information and belief." *Willstrop v. Prince Mktg. LLC*, No. 8:17CV350, 2018 WL 3201888, at *4 (D. Neb. Feb. 15, 2018); *Kampschroer v. Anoka Cty.*, 57 F. Supp. 3d 1124, 1143 (D. Minn. 2014), *aff'd*, 840 F.3d 961 (8th Cir. 2016) ("In the post-*Twombly* and *Iqbal* era, however, the Court finds that merely pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim."); *Pearson v. Wellmark, Inc.*, No. 4:15-CV-3164, 2017 WL 2371142, at *8 (D. Neb. May 31, 2017) (dismissing a complaint because an allegation based on "information and belief" was not a *factual* allegation sufficient to support a claim).

Dr. Mitchell's burden of stating a plausible claim is particularly heavy here, given the deference that courts typically give in matters of university scholarship, teaching, and service. Judges and juries are unlikely to be scholars in a relevant discipline, and they are ill-equipped to pass judgment on scholars' assessments of peers. *Ewing*, 474 U.S. at 226. As Judge Friendly has observed, courts are reluctant to second-guess the academic judgments of scholars through "tired-eye" scrutiny of professors' relative qualifications; unless a plaintiff's qualifications are "clearly and demonstrably superior" to somebody else, nothing can be gained from such a comparison. *Liberman v. Gan*, 630 F.2d 60, 68 (2d Cir. 1980); *cf. Torgerson v. City of Rochester*, 643 F.3d 1031, 1049 (8th Cir. 2011) (collecting cases for the proposition that, in a failure-to-hire case, a discrimination plaintiff must show clearly superior qualifications). The complaint is devoid of any non-conclusory allegations of fact—as opposed to Dr. Michell's "information and belief"—that Dr. Mitchell scored materially lower than a specific colleague of another race, despite having vastly superior performance metrics.

### 3. Dr. Mitchell has not suffered an adverse action with respect to his evaluations.

A *poor* performance evaluation "does not in itself constitute an adverse employment action" because it generally "has no tangible effect upon the recipient's employment." *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000). A *satisfactory* evaluation is even more removed from being an adverse action. *Clegg v. Ark. Dep't of Corr.*, No. 4:05CV00473-WRW, 2006 WL 1730774, *5 (E.D. Ark. June 20, 2006) (noting that "a 'satisfactory' evaluation can hardly be considered an

adverse action"). The evaluation records conclusively establish that Dr. Mitchell has never received a sub-satisfactory evaluation, and he does not allege otherwise. *See* ECF 53-19 through ECF 53-27.

The performance evaluations have had no material impact on Dr. Mitchell's pay, with the exception of the fact that they *helped* him to obtain tenure and a promotion-related salary increase in summer 2021. The publicly available compensation records used to prepare the compensation table above show that UA Little Rock has not given merit raises to faculty members since the 2016-2017 academic year—a raise that would have been based on the "favorable" review that Dr. Mitchell received from Dr. Clea Hupp (not Dr. Porter) in February 2016. ECF 50, ¶ 50. The "raise pool" mentioned in the evaluations has been non-existent, which is why Dr. Mitchell has not alleged that any single evaluation impacted his salary for the following academic year.

Also, Dr. Mitchell's suggestion that his performance evaluations might have hampered his ability to get future promotions (if he had remained on the UA Little Rock faculty) is illogical and does not establish an adverse action. ECF 50, ¶¶ 49, 110. His evaluations, which started as "satisfactory" in his first year and trended higher in subsequent years, were good enough to secure his promotion to associate professor and award of tenure in summer 2021. Since then, Dr. Mitchell's evaluations have been even better, and no reason exists to infer that he would have been out of the running for a promotion to full professor at the right time. Importantly, speculation about future promotions does not constitute a materially adverse action under the

civil-rights laws. *See Murry v. Gonzales*, No. 5:04-cv-498, 2006 WL 2506963, at *9 (M.D. Fla. Aug. 28, 2006) (finding arguments that a low evaluation could have affected future promotions did not establish adverse action because such a claim was purely speculative); *Beaumont v. Tex. Dep't of Crim. Justice*, 468 F. Supp. 2d 907, 927 (E.D. Tex. 2006) (finding an employee's subjective beliefs about speculative future promotions did not constitute a materially adverse action).

Finally, Dr. Mitchell contends that Dr. Porter's changes to the 2019 and 2022 evaluations, in response to Dr. Mitchell's questions, were themselves adverse actions. ECF 50, ¶ 254, 256. But this understanding of the law is backwards; an employer's remedial actions can nullify any fleeting harm that the employee might have experienced. *See, e.g.*, *Jackson*, 548 F.3d at 1141-42 (finding that an employee's three-month disqualification from her position as a driver, which violated the employer's own policy, was not an adverse employment action where the employer "recognized its mistake, took corrective action, and reinstated" the employee with backpay); *Taylor*, 350 F.3d at 1293 (concluding that other circuits have correctly held that "an employer may cure an adverse employment action" and finding that a corrected performance rating precluded liability under Title VII). If the rule were otherwise, "there would be absolutely no incentive for employers to make adjustments for past conduct." *Id.* at 1294.

## C.   Incident 3: Memorandum of Understanding

### 1.   Dr. Mitchell has not alleged that a similarly situated history professor secured an MOU on pre-tenure requirements.

Dr. Mitchell alleges that, in around December 2018, UA Little Rock did not enter into a memorandum of understanding (MOU) with him. The MOU would have allegedly allowed him to get credit for "digital projects," which were "not described in the [history department's] bylaws." ECF 50, ¶ 71. But Dr. Mitchell does not identify or describe a similarly situated comparator. He does not, for example, allege that other tenure-track professors in the history department have received "credit" for digital projects in connection with the tenure process. Nor does he allege that UA Little Rock allowed other history professors to bypass the history department's pre-tenure publication requirements. In the absence of such allegations, Dr. Mitchell cannot establish a plausible inference of intentional race discrimination.

### 2.   UA Little Rock's refusal to enter into an MOU with Dr. Mitchell was not an adverse action.

Dr. Mitchell also concedes that the requirements in the history department's bylaws did not prevent him from obtaining tenure. ECF 50, ¶ 16. Thus, Dr. Porter's alleged failure to "promote" an MOU (ECF 50, ¶ 73) did not constitute an adverse action under the civil-rights laws.

## D.   Incident 4: Grievance Policies and Procedures

### 1.   Dr. Mitchell's allegations boil down to a failure to make an exception to UA Little Rock's usual grievance procedures.

Dr. Mitchell alleges that, after Dr. Porter favorably amended his evaluation in February 2019, he remained dissatisfied with his score and reported the "apparent

discrimination on the basis of race" to a variety of people. ECF 50, ¶ 88. He allegedly asked Dean Sarah Beth Estes and Mia Phillips, a nonparty, "if they could facilitate a meeting with the university's Provost, Chancellor, and stakeholders in the recruitment and retention of minority faculty." ECF 50, ¶ 89.

Dean Estes allegedly met with Dr. Mitchell a few times to understand the nature of his concerns and advised him to follow UA Little Rock's established policy on such matters. ECF 50, ¶¶ 90-92; *see also* ECF 53-28 (UA Little Rock Policy 401.6 Grievance Procedures—Complaints of Discrimination).[16]

UA Little Rock's policy includes an "informal complaint procedure," which does not result in disciplinary action, and a "formal complaint procedure," in which a human resource officer will investigate the matter "or convene a hearing committee to investigate and review the facts." ECF 53-28. The hearing committee's tasks include "interviewing the complainant" and other individuals who might have relevant information. If the complaint is found to have merit, the hearing committee "may impose sanctions or make recommendations for other disciplinary actions." *Id.* The policy also contains provisions regarding confidentiality. *Id.*

After UA Little Rock officials directed Dr. Mitchell to its ordinary procedure (the grievance process) rather than creating a special forum, Dr. Mitchell eventually lodged a formal grievance. ECF 50, ¶ 97. But Dr. Mitchell did not like UA Little Rock's

---

[16] UA Little Rock's procedures are discussed in the complaint, and they have been challenged as unlawful. As such, they are "necessarily embraced" by the complaint and should be made a part of the record at this procedural stage. In addition, the policy is a public record that can be considered on a motion to dismiss. It is available at https://ualr.edu/humanresources/grievance-procedures/.

grievance policy, which he believed was too "adversarial." ECF 50, ¶ 100. He enlisted an attorney to "report[] his concerns" in more detail. ECF 50, ¶ 101. He also "notified UA Little Rock that he would not participate in person in the hearing." ECF 50, ¶ 128. Nevertheless, the hearing committee's volunteer chairperson, Dr. Krista Lewis of Anthropology Department, "encouraged Dr. Mitchell to submit written materials for their consideration, so he did." *Id.*

In July 2019, the hearing committee released its findings. ECF 50, ¶ 137; ECF 50-1, at 17-19 (Am. Compl. Ex. 13). It found insufficient evidence to conclude that Dr. Porter or the four members of the APT Committee were discriminatory in their treatment of Dr. Mitchell. *Id.*

##### 2. Dr. Mitchell does not allege that UA Little Rock has allowed similarly situated persons to bypass its ordinary grievance process.

Critiques of an investigatory or dispute-resolution process do not support a plausible employment-discrimination claim. Dr. Mitchell's contention, much like his claim regarding the MOU, is that UA Little Rock should have departed from its usual way of doing business and adopted Dr. Mitchell's preferred policies and procedures. But he has identified no other individuals who received such an exception to the grievance policy, and the policy exists precisely to avoid actual or perceived unfairness. Nor has Dr. Mitchell alleged any instances in which a grievant's ability to utilize the assistance of counsel (or other procedures) have been handled differently. Dr. Mitchell's critiques of the investigatory and dispute-resolution process are not actionable as a matter of law. *See McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855,

997 (8th Cir. 2009) ("[S]hortcomings in an investigation do not by themselves support an inference of discrimination."); *Pighee v. L'Oreal USA (Prod.), Inc.*, 351 F. Supp. 2d 885, 893 (E.D. Ark. 2005) (noting that the plaintiff "failed to present this Court with any evidence that [the defendant] conducted its investigation differently than it did in other cases.").

### 3. The complaint does not allege an adverse action in connection with the grievance proceedings.

Although a termination or demotion might be an adverse action, UA Little Rock's refusal to tailor its dispute-resolution procedure to Dr. Mitchell's liking is most certainly not. And even if UA Little Rock had no policy at all, "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action" because "an employee whose complaint is not investigated cannot be said to have thereby suffered punishment for bringing the same complaint." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010); *see also Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (holding that an employer's alleged failure to investigate the plaintiff's internal complaint was not an adverse action because "it did not effect a significant change in *the plaintiff's* employment status").

### E.   Incident 5: "Spoliation"

Dr. Mitchell alleges that he experienced "unwelcome spoliation" when the faculty members serving on the APT Committee failed to retain (or perhaps did not create) individual committee members' scores for Dr. Mitchell or anyone else, with the exception of a lone record in 2015. ECF 50, ¶ 104. He also alleges, in a conclusory fashion, that various individuals committed "spoliation of records of Dr. Mitchell's

discriminatory pay disparity." ECF 50, ¶ 232. Neither allegation gives rise to a plausible claim of race discrimination.

### 1. Dr. Mitchell does not have a private cause of action to enforce Title VII's recordkeeping requirements.

The law leaves recordkeeping requirements to public-enforcement channels. The recordkeeping provisions under Title VII—namely, 43 U.S.C. § 2000e-8(c) and 29 C.F.R. § 1602.14—do not confer a private right of action. *Carlson v. Ameriprise Fin.*, No. CV 08-5303 (MJD/JJK), 2009 WL 10678283, at *14 (D. Minn. May 21, 2009), *aff'd*, 409 F. App'x 976 (8th Cir. 2011) (holding that actions commenced by the EEOC or Attorney General are the only means of enforcing the recordkeeping requirements).

### 2. UA Little Rock's non-retention of "score sheets" cannot be discriminatory if similarly situated persons were treated the same way.

Dr. Mitchell notes that, in response to a FOIA request, UA Little Rock's attorney, Mandy Hull, explained to Dr. Mitchell's attorney that "there was only one scoring sheet retained, and it contains the 2015 APT scores [for faculty members in the history department]." ECF 50, ¶ 104. However, Dr. Mitchell fails to explain how he could have been subjected to intentional race discrimination due to his employer's generally applicable recordkeeping practice. He does not, for example, allege that UA Little Rock retained "score sheets" for similarly situated white faculty members. The omission renders his discrimination theory implausible.

Should the EEOC ever call upon UA Little Rock to answer for its non-retention of "score sheets," there is a straightforward explanation: the formal evaluation records include an average of the committee members' scores, and there is no reason to believe that a preliminary notation of scores would have yielded useful information worthy of keeping. For example, the 2015 record that Dr. Mitchell's attorney obtained from UA Little Rock under FOIA in May 2019 (ECF 50, ¶ 104) did not identify which committee members were responsible for the specific scores used to compute the average. *See* ECF 53-29, at 2. Likewise, similar records for subsequent years would have contained no useful information.

### 3. Dr. Mitchell's allegations regarding pay-correction records do not support an inference of a racial motive.

Dr. Mitchell's averments regarding records on UA Little Rock's efforts to correct the pay disparity with Dr. Heil are baffling. For one thing, UA Little Rock's corrective pay actions were adequately documented—not destroyed—through written memoranda and electronic notations in UA Little Rock's payroll system. Dr. Mitchell's own complaint includes the records as exhibits. ECF 50-1, at 5-6 (Am. Compl. Ex. 4 & 5). Moreover, information pertaining to Dr. Mitchell's compensation—as well as the pay of every other UA Little Rock employee—has long been available on UA Little Rock's Open Checkbook website and publicly available operating budgets.

At most, Dr. Mitchell seems to believe that the memoranda should have been more thorough or that Dr. Burton, the former Provost, should have created an additional memorandum to go alongside Dr. Drale's notation in Exhibit 5 to the amended

complaint. ECF 50-1, at 6. But his allegations do not plausibly give rise to an infer-ence of intentional race discrimination. The amended complaint does not allege facts showing that UA Little Rock would have created additional records if a similarly sit-uated employee of another race had made a complaint about a pay disparity. Nor does Dr. Mitchell identify any comparators.

In the final analysis, no law compelled UA Little Rock to create more records on the pay-disparity issue. Dr. Mitchell's claim of race discrimination is implausible on its face.

### 4. UA Little Rock's alleged non-retention and non-creation of records were not adverse actions.

The two acts of alleged "spoliation" have not had a materially adverse impact on Dr. Mitchell's employment, and he has not alleged otherwise. He has always been apprised of his compensation and the APT Committee's aggregate scores, and UA Little Rock made adequate notations of its efforts to fix the pay disparity. Dr. Mitchell has suffered no tangible consequences from the non-creation (or non-retention) of ad-ditional records. On this essential element, Dr. Mitchell's spoliation-based theory of intentional discrimination is implausible on its face.

### F.   Incident 6: IRB Proceedings

### 1. The Role of Institutional Review Boards

Institutional Review Boards (IRBs) "are charged with providing an independ-ent evaluation that proposed research is ethically acceptable." Christine Grady, *In-stitutional Review Boards, Purposes and Challenges,* CHEST (Nov. 2015), *available*

*at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4631034/. IRBs often look for potential biases, and they evaluate compliance with regulations and laws designed to protect human subjects. *Id.*  Federal agencies that provide grants and other federal funds "can and often do extend federal regulatory requirements to all of their human subjects research." *Id.* In addition, institutions can devise their own policies that go beyond the requirements contained in the regulations. "Increasingly, IRBs are tasked with responsibilities beyond those required by federal regulation, including, for example, review of conflicts of interest, *compliance with privacy regulations*, training of investigators, scientific review, and monitoring of clinical trial registration, among others." *Id.* (emphasis added). In other words, the federal regulations provide the minimum floor for what is required in projects funded by federal grants. An institution is always free to impose additional requirements or extend IRB scrutiny to non-federal projects. 45 C.F.R. § 46.101(f); 45 C.F.R. § 46.112.

## 2.     UA Little Rock's IRB Policies and Procedures

UA Little Rock adopted an IRB governance document on May 15, 2018. The applicable policy ("Research Protection Program" or "RPP Policy") is attached as ECF 53-30.[17] As required by the federal regulations, the IRB carries out its duties "independently of the Institution," and nobody on the campus—including the Chancellor (*i.e.*, "institutional officer")—may "attempt to improperly influence the IRB." ECF 53-30, RPP Policy 1.06; *see also* 45 C.F.R. § 46.109(a) (providing that the IRB is the only

---

[17] The RPP Policies and Procedures are embraced by the complaint, which discusses them at length, and they are publicly available at https://ualr.edu/irb/.

body with authority to approve or disapprove research activities covered by the policy); 45 C.F.R. § 46.112 (stating that, although other campus officials may have a separate role in approving research projects, they cannot approve research that has not been approved by an IRB).

The IRB must approve all human participant research. ECF 53-30, RPP Policy 3.01. "Research" is defined as "any systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge." ECF 53-30, RPP Policy 3.01-2.1(A). A "human subject" is a "living individual about whom an investigator (whether professional or student) conducting research obtains, (1) data through intervention or interaction with the individual or (2) identifiable private information." ECF 53-30, RPP Policy 3.01-2.1(F). "Private information," in turn, means "information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information which has been provided for specific purposes by an individual which the individual can reasonably expect will not be made public (*e.g.*, academic record information)." ECF 53-30, RPP Policy 3.01-2(J). The policy contains certain exceptions to the review requirement, including for research involving "public data sets," which are publicly available data sets included on UA Little Rock's official list. ECF 53-30, RPP Policy 9.02-2.3.

The IRB makes the ultimate determination of whether an activity constitutes human participant research; individuals who are unsure about a project's status are

urged to seek guidance from the IRB. ECF 53-30, RPP Policy 3.01-2.5. If an investigator fails to obtain IRB approval for a project that is later deemed to be human participants research, the failure to obtain IRB approval can be grounds for a finding of "serious noncompliance." ECF 53-30, RPP Policy 12.02-2.1(A)(5).

Violations of the IRB policies can have a range of mild consequences. At worst, the IRB can order that the research project be suspended or terminated. ECF 53-30, RPP Policy 10.02, 12.02. Other possible actions include increased monitoring of the project and requiring additional training of the principal investigator. ECF 53-30, RPP Policy 12.02-2.4(C). The IRB is not empowered to discharge a principal investigator, suspend him, or take other disciplinary actions.

The IRB at UA Little Rock also has a policy of reporting to the U.S. Department of Health and Human Services' Office for Human Research Protections (OHRP) any instances of serious noncompliance. ECF 53-30, RPP Policy 12.03; *see also* 45 C.F.R. § 46.108(a)(3)(4) (requiring reports of serious noncompliance). UA Little Rock has a generally applicable policy of submitting such information to OHRP even when the matter does not involve federal funds. *Id.* Once the report is submitted to OHRP, the federal regulations (codified at 45 CFR Part 46) do not mention any actions that might be taken against a principal investigator. Rather, the regulations are concerned with whether an *institution* "has materially failed to comply" with the regulations. 45 C.F.R. § 46.123(a).

Before issuing a finding of noncompliance, the IRB follows the procedure set forth in Section 12.02 of the RPP Policies and Procedures. After receiving an allegation of noncompliance, the Research Compliance Officer, in consultation with the IRB Chairperson, sends a letter to the principal investigator within 72 hours of the receipt of the allegation. ECF 53-30, RPP Policy 12.02-2.3(C). The letter might include a directive that the investigator cease research-related activities until the matter is resolved. *Id.* If the Research Compliance Officer and IRB Chairperson believe that an incident of noncompliance has merit, they may dispatch an audit team to investigate the matter, including submitting questions to the principal investigator. ECF 53-30, RPP Policy 12.02-2.3(D).[18] Thereafter, the IRB convenes within eight days to hear the audit team's verbal report of the investigation and render a decision. *Id.* A principal investigator or other faculty member who is dissatisfied with the IRB's determination may appeal. ECF 53-30, RPP Policy 12.02-2.4(D). The principal investigator is allowed to "bring non-participating representatives who may discretely [*sic*] advise the PI, as long as it is not disruptive to the meeting." *Id.* The IRB must render its decision on the appeal soon thereafter. *Id.*

### 3.   Dr. Mitchell's IRB-Related Allegations and Exhibits

Dr. Mitchell alleges that, in November 2019, one of his students contacted him to discuss privacy-related concerns with a class project. ECF 50, ¶ 134. The project allegedly involved "a ledger of names of residents of a juvenile detention facility for

---

[18] The RPP Policies and Procedures mistakenly have two portions of Section 12.02 labeled as subsections "2.3."

Black boys that included entries from the 1950s through 1978." ECF 50, ¶ 135. Thus, by Dr. Mitchell's own account, some of the individuals on the ledger were likely still alive. He tasked graduate students with transcribing the contents of each entry into databases to facilitate the creation of a digital index of the records. ECF 50, ¶ 135.

On November 25, 2019, soon after the student raised concerns, Dr. Mitchell received a communication from Crystal Croswell, Research Compliance Officer, instructing him to cease and desist from further activities on the project until the IRB audit team could make its findings. ECF 50, ¶ 136; ECF 50-2, at 5 (Am. Compl. Ex. 16). Ms. Croswell also instructed Dr. Mitchell to "collect" documentation associated with the project and store the data "in a secure location and accessible only to [him]." *Id.* At no point did Ms. Croswell instruct Dr. Mitchell to delete data or destroy materials.[19] Soon thereafter, Dr. Blevins-Knabe, IRB Chairperson, asked Dr. Mitchell to explain the project through a series of questions. ECF 50, ¶ 137.

Dr. Mitchell explained that "students were informed that the records would be restricted to their view only and that once the index was completed that it would be surrendered to the archive and likely unavailable for publication until the records were released to the public." ECF 50-2, at 8 (Am. Compl. Ex. 16). Moreover, "[s]tudents agreed that they would work on the project and would not share images

---

[19] The statement that "none of the data associated with, or derived from, this project should be retained by anyone" was obviously meant to cover anyone *except* Dr. Mitchell. Otherwise, the subsequent statement that "the data must be stored in a secured location and accessible only to you" would have made no sense. Dr. Mitchell could, of course, have asked for clarification on the point if necessary.

or the content of the records." *Id.* "Students were told that the institution would determine when the records were released and would likely only allow use of aggregate data from the index/dataset they were creating." *Id.* Finally, Dr. Mitchell ensured that the records were maintained on a restricted "share drive" that could only be accessed by members of the class. *Id.* Thus, Dr. Mitchell acknowledged that the records were not "public" at the time of the project, and he apparently believed that it was important that students protect the records' confidential status. But he admittedly did not seek the IRB's input on his chosen methods for maintaining the confidentiality of the information or whether additional steps needed to happen.

The IRB assigned an audit team, and it eventually affirmed the audit team's findings. The IRB prepared a written decision, dated February 7, 2020, that found Dr. Mitchell in "serious noncompliance" with the procedures because he "failed to request a review of his research project." ECF 50, ¶ 142. The IRB noted that the information in the ledger included names, date received, nature of the crime or offense, date of sentence, town, date of transfer, and remarks. ECF 50-2, at 28-30 (Am. Compl. Ex. 17). Although the IRB found the violation to be serious, it did not require Dr. Mitchell to terminate the project. Instead, the IRB merely concluded that "any further work on the database project concerning the Wrightsville Negro Industrial School for Boys must be submitted to the IRB in accordance with the standard process for submission of projects to the IRB." *Id.*

Dr. Mitchell appealed the matter, and the IRB upheld the findings and sent a report to OHRP as UA Little Rock's policy required. ECF 50, ¶ 144. To this day, Dr.

Mitchell has never received any indication that OHRP will take adverse action against him. ECF 50-4, at 8 (Am. Compl. Ex. 29) (telling Dr. Mitchell's attorney that UA Little Rock's concerns about the project were not "reportable" to OHRP). In fact, OHRP determined that it would take "no action" on the matter in March 2022 after concluding that the identities of the former juvenile offenders could not be readily determined and that the transcription project did not constitute "research" under the convoluted definition set forth in 45 C.F.R. § 46.102(l). ECF 53-31. As with its January 2022 email to Dr. Mitchell's counsel, OHRP's March 2022 email to UA Little Rock stated that "institutions may implement policies and procedures for research that go beyond HHS regulations and we do not wish to dissuade UALR in that regard." ECF 53-31.

### 4. Dr. Mitchell does not have a private cause of action to enforce OHRP's regulations, and his IRB-related critiques are misguided and distracting.

The amended complaint spills a substantial amount of ink on the notion that UA Little Rock's IRB policy "does not align" with the current version of 45 C.F.R. § 45.102(l), which Dr. Mitchell believes should be interpreted as excluding all historical scholarship. ECF 50, ¶ 139. But Dr. Mitchell does not allege any facts suggesting that the alleged misalignment has any bearing on this discrimination lawsuit. Nor does he have a private right of action to sue for alleged incompatibility between an institution's IRB policy and the federal regulations.

48

A section of the Public Health Service Act, 42 U.S.C. § 289, empowers OHRP to establish a compliance oversight process regarding violations of the rights of human subjects of research conducted or supported by the U.S. Department of Health and Human Services. The regulations, codified at 45 C.F.R. Part 46, require each institution engaged in human-subjects research under the Department's oversight to provide written assurance that it will comply with the federal regulations, and OHRP is empowered to investigate and enforce allegations of noncompliance with the regulations. If Dr. Mitchell believes that the IRB at UA Little Rock has failed to comply with the federal regulations, he can follow the complaint procedures on OHRP's website,[20] just as he has already done. The relevant statute does not authorize him to act as a private attorney general on OHRP's behalf, and none of his ten claims for relief arises under this enactment. *See Tilousi v. Arizona State Univ.*, No. 04-cv-1290-FJM, 2005 WL 6199562, at *2 (D. Ariz. March 3, 2005) (holding that 42 U.S.C. § 289 and 45 C.F.R. § 46.116 "does not provide a private right of action nor does it evidence an intent do so").

Dr. Mitchell's other objections are likewise unfounded. He implies that there must be "alignment" on everything, but his own exhibits demonstrate that OHRP's regulations do not displace state regulations or institutional policies that may subject historical scholarship to closer scrutiny. Moreover, there is nothing in the federal regulations suggesting that all historical scholarship should be exempt from IRB review, regardless of what the project entails; if a humanities project is "designed to develop

---

[20] OHRP's instructions for "submitting a complaint" are available at
https://www.hhs.gov/ohrp/compliance-and-reporting/submitting-a-complaint/index.html.

or contribute to generalizable knowledge," it is still "research" under the federal definition. 45 C.F.R. § 46.102(l); *see also* Final Rule, Federal Policy for the Protection of Human Subjects, 82 Fed. Reg. 7149, 7153 (Jan. 19, 2017) ("Regarding the concerns expressed that the Common Rule departments and agencies are not authorized to regulate humanities and social science research, this challenge has been asserted previously . . . and in each case the regulatory agencies concluded that regulation of humanities and social science research is justified. We continue to assert the authority to regulate humanities and social science research that falls within the scope of the final rule.").

Dr. Mitchell's conclusory assertion that the materials used in his juvenile-offender project did not implicate any privacy concerns is also curious. He now says that the project did not involve "private information" because "[c]urrent privacy laws did not exist at that time, and they do not apply retroactively." ECF 50, ¶ 135. But the exhibits to the amended complaint show that Dr. Mitchell undertook a number of privacy-protecting measures during the relevant time period, which would have been an odd thing to do if no privacy issues were at stake. ECF 50-2, at 8 (Am. Compl. Ex. 16).

In any event, Dr. Mitchell is incorrect as a matter of law. Arkansas, like other states, has long empowered courts to close court proceedings involving "delinquency" charges against children, in addition to prohibiting the news media from publishing the names of children involved in such proceedings absent court approval. *See* Acts 1911 No. 215, § 2; Acts 1975, §§ 43-44. Moreover, at the conclusion of the judicial

proceedings, the law has historically required that the details of the matter—including the nature of the child's offense—be kept under seal. For example, the law governing the Negro Boys' Industrial School in Wrightsville contained a provision stating that a judge's order of commitment "shall not state that the child is delinquent or dependent, nor shall it state the offense of which the child is guilty, but shall merely state that the person named has been adjudicated to be a proper person for commitment." ECF 53-32 (Acts 1955, No. 400, § 4)**.** The Act further stated that the court "shall transmit to the [Negro Boys' Industrial School] a report on the child setting forth in detail all pertinent advice concerning his background . . . and the reasons for the child's commitment," although such information was "exclusively for the benefit of the School and shall not be disclosed by officials of said School." *Id*. Thus, the public record on the matter—the court's order of commitment—was not supposed to describe the offense, and the report transmitted to the school was intended solely to enable school officials to understand the child's situation and never to be disclosed to outside persons.[21] The subjects of Dr. Mitchell's project had every reason to anticipate that their criminal offenses as juveniles would never see the light of day.

### 5. Dr. Mitchell's IRB-related claim of discrimination is implausible because he has not alleged that anyone made Dr. Blevins-Knabe aware of similar projects.

Dr. Mitchell eventually convinced OHRP that the juvenile-offender project did not entail "research" under 45 C.F.R. § 46.102(l). But this fact does not plausibly

---

[21] These principles continue to be reflected in current law, which provides that courts may close proceedings involving juveniles and that courts, law-enforcement agencies, and penal institutions must maintain records of the offense as confidential. *See* Ark. Code Ann. § 9-27-309(a), (j), (k).

demonstrate that Dr. Blevins-Knabe (or anyone else) harbored discriminatory animus towards Dr. Mitchell because of his race. A plaintiff must allege facts that, if proved, would demonstrate that the employer lacked an *honest belief* that a violation occurred, bearing in mind that courts are "reluctant to interpret an employer's policy." *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 934 (8th Cir. 2011); *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) ("It is generally for an employer to interpret its own policies . . . ."). Dr. Mitchell's complaint contains no averments giving rise to an inference that Dr. Blevins-Knabe or the other members of the IRB lacked an honest belief that Dr. Mitchell violated the campus policy on human-subjects research. And the fact that Dr. Mitchell knew that he needed to utilize multiple privacy safeguards (*see* ECF 50-2, at 8—Am. Compl. Ex. 16) demonstrates that the IRB's privacy concerns were reasonable. A mere disagreement among professionals on how to apply 45 C.F.R. § 46.102(l)'s definition of "research" does not tend to establish intentional race discrimination.

Dr. Mitchell attempts to overcome this problem by alleging that he "is the only professor in the History Department over whom the IRB Department asserts oversight and regulation powers." ECF 50, ¶ 160. But his allegations say nothing about persons who were similarly situated in all relevant respects, so they do not help establish a plausible claim of discrimination. Perhaps nobody made Dr. Blevins-Knabe aware of similar violations through a student complaint, administrative referral, or other means. *Elam v. Regions Financial Corp.*, 608 F.3d 873, 881 (8th Cir. 2010) (no discrimination where decisionmaker was unaware of incidents involving others);

*Kipp v. Missouri Hwy. & Transp. Comm'n*, 280 F.3d 893, 898 (8th Cir. 2002) (same). Or, perhaps other scholars have prudently sought preclearance from the IRB with regard to projects involving the transcription of nonconsenting persons' private information or cautiously avoided such projects altogether. These are "lawful, obvious alternative explanations" for the alleged conduct, so the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *McDonough*, 799 F.3d at 946.

### 6.   Dr. Mitchell did not suffer an adverse action as a result of the IRB proceedings.

Dr. Mitchell's interactions with the IRB did not involve a tangible employment action under the civil-rights laws. UA Little Rock did not terminate Dr. Mitchell, demote him, or impose a suspension after the IRB's finding in February 2020. In fact, the exhibits to the operative complaint (ECF 50-2, at 28-30—Am. Compl. Ex. 17) show that the IRB did not even prohibit Dr. Mitchell from resuming the juvenile-offender project. He also admits that UA Little Rock awarded him tenure in summer 2021 (ECF 50, ¶ 16), so the incident did not negatively impact his career trajectory. Finally, OHRP took "no action" on the IRB's referral. ECF 53-31; *see also* ECF 50-4, at 8 (Am. Compl. Ex. 29). No indication exists that Dr. Mitchell suffered a loss of grant funding, and any suggestion of future consequences is speculative. The imposition of an "adverse action" is an essential element of Dr. Mitchell's race discrimination claim, and he has failed to allege facts that support such an action.

## II.   Dr. Mitchell's retaliation claims under Section 1981 and Title VII are implausible (claim 8).

Title VII prohibits an employer from retaliating against an employee who has "opposed" a practice prohibited by Title VII or "participated" in a proceeding authorized by Title VII. 42 U.S.C. § 2000e-3(a). "The two clauses of this section typically are described, respectively, as the opposition clause and the participation clause." *Gilooly v. Missouri Dep't of Health & Senior Servs.*, 421 F.3d 734, 741 (8th Cir. 2005) (Colloton, J., concurring). The elements of a retaliation claim under Section 1981 "are identical." *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1063); *see also Takele v. Mayo Clinic*, 576 F.3d 834, 838 (8th Cir. 2009) ("We apply the same analysis to claims of discrimination and retaliation under Title VII and 42 U.S.C. § 1981.").

Dr. Mitchell can establish a *prima facie* case of retaliation by demonstrating that (1) he engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1146 (8th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 83 (2006)). To establish a causal link, Dr. Mitchell must prove that "the desire to retaliate was the but-for cause of the challenged employment action." *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). "More than a temporal connection between the protected conduct and the adverse employment is required." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). Although a close temporal connection can help establish a *prima facie* case of causation, the proximity must be a "matter of weeks" to shift the burden to the employer. *Sprenger*

*v. Federal Home Loan Bank*, 253 F.3d 1106, 1113-14 (8th Cir. 2001). By contrast, an "interval of two months" between the protected activity and adverse action "so dilutes an inference of causation" as to preclude the possibility of a causal link. *Kipp v. Missouri Hwy. Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002); *see also Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (holding that temporal proximity of thirteen days was "sufficient, but barely so, to establish causation, completing [the plaintiff's] *prima facie* case").

### A. Dr. Mitchell was not subjected to a materially adverse action.

"A *prima facie* case of retaliation requires a showing that the alleged retaliatory action was materially adverse, that is, the action 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination [or other protected activity].'" *Littleton v. Piolet Travel Centers, LLC*, 568 F.3d 641, 644 (8th Cir. 2009) (quoting *Burlington*, 548 U.S. at 68). The Eighth Circuit's post-*Burlington* cases "have consistently held that, to be materially adverse, retaliation cannot be trivial; it must produce some injury or harm." *Littleton*, 568 U.S. at 644. For example, the Eighth Circuit has held that sending a critical letter and falsely reporting an employees' deficient performance "were actions that did not establish a *prima facie* case of retaliation, absent showings of materially adverse consequences to the employee." *Id.*

The allegedly retaliatory actions that Dr. Mitchell presents in the amended complaint somewhat overlap with the discrete areas of alleged disparate treatment discussed above. Specifically, he alleges that he was subjected to unlawful retaliation through (1) UA Little Rock's non-retention of evaluation "score sheets" (in retaliation

for complaining about evaluations) and non-creation of additional pay-correction memoranda (in retaliation for complaining about compensation), (2) not allowing Dr. Mitchell to bypass UA Little Rock's regular grievance procedures, (3) finding a violation of the IRB policy and referring the matter to OHRP, and (4) the undersigned counsel's statements in an earlier brief and at a legislative hearing. ECF 50, ¶¶ 339-344.

There is no need to engage in another discussion of each discrete incident here because none can plausibly constitute a "materially adverse" consequence under *Burlington*. For example, the destruction of an informal "score sheet," which would have been ancillary to a formal evaluation record containing an average of the committee members' scores, would not have dissuaded a reasonable person from complaining about discriminatory evaluations. Similarly, the non-creation of another record on the correction of a pay disparity would not have dissuaded a reasonable person from complaining about inequality in compensation—particularly since administrators had already documented the issue in a memorandum (ECF 50-1, at 5—Am. Compl. Ex. 4) and database notation (ECF 50-1, at 6—Am. Compl. Ex. 5). Nor would the IRB's referral to OHRP, which closed the matter after taking "no action," have dissuaded anyone from engaging in protected activity. ECF 50-4, at 8 (Am. Compl. Ex. 29); ECF 53-31.

Dr. Mitchell also alleges that he was subjected to retaliation when the defendants allegedly "stated to the Plaintiff, the Arkansas Legislature, the campus, the public, and this Court, that they were right to report him to the federal government for

research misconduct, even after they had notice they were wrong." ECF 50, ¶ 345. This allegation is conclusory and insufficient under *Twombly* because it gives no indication as to how any of the defendants communicated to others on the topic of "research misconduct," what they said, when they said it, or how Dr. Mitchell's race had anything to do with the statements.

Dr. Mitchell's ire appears to be aimed at the undersigned counsel—not the individual defendants in this lawsuit—given the more specific information contained elsewhere in the amended complaint.[22] He complains, for example, that "court pleadings" have "described [him] disparagingly as seeking special access or treatment." ECF 50, ¶ 216. He also alleges that counsel presented "misleading" information to the Claims Review Litigation Oversight Committee of the Arkansas General Assembly. ECF 50, ¶¶ 204-05.

According to the video clip cited at footnote 3 of the amended complaint, however, the undersigned counsel merely expressed surprise at the fact that Dr. Mitchell filed a lawsuit a few days after UA Little Rock promoted him, gave him tenure, and raised his salary. The prospect of not getting tenure was at the top of Dr. Mitchell's mind when he initiated a grievance in February 2019 (ECF 50-1, at 10—Am. Compl. Ex. 9), and those concerns ceased to exist by summer 2021. Counsel further offered to give interested legislators a copy of Defendants' 55-page brief if they wanted to read a blow-by-blow response to Dr. Mitchell's prolix complaint. The legislative forum

---

[22] The individual defendants have not submitted any affidavits, and this case has not entailed an evidentiary hearing. Nor have the individual defendants appeared before a legislative committee about this case.

was no place for a lengthy presentation of the case from each side's perspective. Counsel's verbal statement contained no mention of "research misconduct," and they bore no indicia of racial animus.

The fact that the undersigned counsel's statements to a legislative committee have found their way into Dr. Mitchell's operative complaint underscores the lawsuit's implausibility. A defense lawyer's refutation of a plaintiff's claim of workplace harassment cannot rise to a retaliation claim or the imposition of damages against the lawyer's clients. For one thing, one person's statements cannot make another person vicariously liable under 42 U.S.C. § 1981 (and related statutes) as a matter of law.[23] In addition, an attorney's oral and written statements incidental to a judicial or quasi-judicial proceeding are privileged. *See Imbler v. Pachtman*, 424 U.S. 409, 429 n.23 (1976); *Mock v. Chicago, Rock Island & Pac. R.R. Co.*, 454 F.2d 131, 133 (8th Cir. 1972); *Librace v. Florida Dep't of Law Enforcement*, No. 2:18-CV-00079-JM-JTR, 2018 WL 3385186, at *2, n.4 (E.D. Ark. 2018). Finally, an opposing lawyer's unflattering characterizations of a plaintiff's claims are an inevitable part of the litigation

---

[23] It is well settled that liability against an individual under 42 U.S.C. §§ 1981 and related statutes must be predicated on an individual's personal involvement in intentional race discrimination. *See, e.g.*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74075 (2d Cir. 2000); *Musikiwamba v. Essi, Inc.*, 760 F 740, 744 (7th Cir. 1985); *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991); *Daniels v. Washington Grp. Int'l*, No. 5:06CV00213 SWW, 2007 WL 9735971, at *2 (E.D. Ark. Jan. 5, 2007) ("Personal liability under § 1981 must be predicated on personal involvement with the alleged discriminatory conduct."); 16 Am. Jur. 2d Civil Rights § 37 (Nov. 2021 Update) ("Since liability under 42 U.S.C.A. § 1981 is premised on personal involvement of a defendant it cannot be imposed vicariously; that is, personal involvement of a defendant is essential."). Therefore, to state a claim under Section 1981, 1983, 1985, or 1986 against Chancellor Drale, Dean Estes, Dr. Porter, and Dr. Blevins-Knabe, the plaintiff must allege specific facts showing that each person—through his or her own actions—violated the law.

process that Dr. Mitchell initiated, and such conduct does do not plausibly constitute a "materially adverse" consequence that might deter protected activity under *Burlington*. If the rule were different, a lawyer would be impermissibly chilled in defending an employment case.

### B. Dr. Mitchell has not alleged a causal link between a protected activity and an adverse action.

#### 1.   Non-Creation of Additional Records on Pay Correction

Dr. Mitchell alleges that Chancellor Drale "committed spoliation of records of Dr. Mitchell's discriminatory pay disparity . . . in retaliation for Dr. Mitchell's raising the issue of this pay disparity." ECF 50, ¶ 339. Dr. Mitchell "raised the issue" regarding his salary on October 13, 2017, when he sent an email to Dr. Porter complaining about the pay disparity. ECF 50-1, at 4 (Am. Compl. Ex. 3). But Dr. Mitchell's email does not count as opposition activity, as a matter of law, because he did not attribute the pay disparity to racial discrimination. *See Pope v. ESA Services, Inc.*, 406 F.3d 1001, 1010 (8th Cir. 2005) (holding that a plaintiff's internal complaint about the absence of black managers was not protected activity under Title VII because the plaintiff did not attribute the absence of black mangers to racial discrimination). Dr. Mitchell's email merely stated that "others" said that race might have played a role in the pay disparity, although Dr. Mitchell discounted this view as mere "speculation." ECF 50-1, at 4 (Am. Compl. Ex. 3). As for Dr. Mitchell's own views on the matter, he stated that he had "no idea" as to how the disparity happened. *Id.* Dr. Mitchell did not personally attribute the compensation issue to racial discrimination, so the

59

October 2017 email does not constitute "opposition" activity under Title VII or Section 1981.

In addition, the amended complaint does not draw a causal link between Dr. Mitchell's email about the pay disparity and an employment action. For one thing, there are no allegations that Dr. Drale was aware of Dr. Mitchell's email to Dr. Porter regarding other individuals' speculation about potential racism. *Lyons v. Vaught*, 781 F.3d 958, 963 (8th Cir. 2015) (holding the defendants' knowledge of protected activity was an essential element of a retaliation claim and the district court erred in not dismissing the complaint on qualified-immunity grounds). Temporal proximity is also lacking. Chancellor Drale's alleged non-creation of additional pay records occurred in March 2018. ECF 50, ¶ 323; ECF 50-1, at 5 (Am. Compl. Ex. 5). The five-month interval between Dr. Mitchell's October 2017 email to Dr. Porter and Chancellor Drale's March 2018 communication to the payroll department saying that her email would be the "only item" she could provide on the issue is insufficient to establish temporal proximity. *Kipp*, 280 F.3d at 897 (holding that a two-month interval "diluted any inference of causation" and foreclosed a retaliation claim).

### 2.   Non-Retention of "Score Sheets"

Dr. Mitchell alleges that Dr. Porter and Dean Estes "committed spoliation of Dr. Mitchell's evaluation score sheets. . . in retaliation for Dr. Mitchell raising the issue of his discriminatory evaluation scores." ECF 50, ¶ 339. He allegedly raised the issue by complaining to Dr. Porter on February 11, 2019, and filing a race-discrimination grievance on the same day. ECF 50, ¶¶ 84, 96-97. But the amended complaint

suggests that the history department's practice of not retaining the "score sheets" began in 2016 or earlier. ECF 50, ¶¶ 104, 324. Thus, because this non-retention practice began "prior to [Dr. Mitchell's] protected activity" in February 2019, "there is no inference of a causal connection." *Devin v. Schwan's Home Service, Inc.*, 491 F.3d 778, 878 (8th Cir. 2007).

### 3.   Adherence to Grievance Policy

Dr. Mitchell alleges that UA Little Rock's decision to follow its ordinary grievance procedures was an act of retaliation for "raising the issue of discriminatory employment terms and conditions." ECF 50, ¶¶ 340. The problem with this argument, of course, is that UA Little Rock's adherence to a policy that predated Dr. Mitchell's February 2019 grievance cannot plausibly be attributed to retaliatory animus. Dr. Mitchell's case might be stronger if he had alleged that the defendants have allowed similarly situated complainants to dictate the terms of UA Little Rock's grievance procedures—on a case-by-case basis—in contravention of the institution's generally applicable rules. But he has made no such allegations, so his retaliation claim is implausible on its face.

### 4.   IRB Proceedings

Dr. Mitchell alleges that Dr. Blevins-Knabe, with the "cooperation" of Dr. Porter, Dean Estes, and Chancellor Drale, "abused" the power of the "IRB office" in retaliation for his complaints of discrimination "to UALR, the EEOC, and this Court." ECF 50, ¶ 343. But his timeline does not support his conclusory assertion. Dr. Mitch-

ell filed his grievance in February 2019 (ECF 50, ¶¶ 96-97), but the IRB did not communicate with Dr. Mitchell about potential research misconduct until Crystal Croswell's cease-and-desist memo of November 25, 2019 (ECF 50-2, at 5—Am. Compl. Ex. 16). And the IRB did not issue its written decision on the matter until February 2020. ECF 50-2, at 28 (Am. Compl. Ex. 17). These lengthy intervals of nine and twelve months are far too long to establish temporal proximity between a protected activity and an adverse action as a matter of law. Moreover, the amended complaint does not allege that Dr. Blevins-Knabe's conduct was the subject of Dr. Mitchell's formal grievance in February 2019 or that she knew anything about the grievance proceedings. *See Williams v. Stewart*, No 2:10CV00039 JMM/HDY, 2010 WL 4509829, at *2 (E.D. Ark. Aug. 25, 2010) (finding that the plaintiff did not sufficiently allege a plausible theory of retaliatory animus merely because he filed grievances against three of the prison officials named as defendants; the officials' own actions were "not the issues" in any of the proceedings).

Attributing the IRB's actions to retaliatory animus for filing an EEOC charge and lawsuit is equally implausible. Dr. Mitchell filed his first EEOC charge of discrimination in May 2019 (ECF 40, ¶ 17; ECF 50, at 2—Am. Compl. Ex. 2), which was six months before the IRB sent its first communication to Dr. Mitchell. Even if UA Little Rock had summarily terminated Dr. Mitchell in November 2019 rather than merely instructing him to pause the juvenile-offender project, "[t]he fact of termination six months after an incident is by itself insufficient to support a claim of causal connection." *Feltmann v. Sieben*, 108 F.3d 970, 976 (8th Cir. 1997).

Conversely, Dr. Mitchell did not file this lawsuit until October 2021 (ECF 1), and he did not file the lawsuit in Pulaski County Circuit Court until July 2021 (ECF 53-33). His first lawsuit therefore came five months *after* the IRB made its finding of noncompliance in February 2021. Dr. Blevins-Knabe and the other defendant obviously could not have retaliated in February 2021 for a protected activity that had not yet occurred.

Finally, the amended complaint reveals the existence of "lawful, obvious alternative explanations" for the IRB's scrutiny of Dr. Mitchell, so the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *McDonough*, 799 F.3d at 946. Dr. Mitchell says the IRB sent a cease-and-desist memorandum to him a few days after a graduate student expressed privacy-related concerns about the juvenile-offender project in an email. ECF 50-2, at 1 (Am. Compl. Ex. 15). Thereafter, a complaint resembling the student's email was filed. ECF 50-3, at 16 (Am. Compl. Ex. 24). The fact that someone raised concerns about a transcription project involving former juvenile offenders—not a protected activity many months earlier or later—is an obvious alternative explanation for the IRB's investigation.

### 5. Lawyer's Statement

The undersigned counsel's statement to a committee of the General Assembly in January 2022 was four months after Dr. Mitchell commenced this lawsuit in October 2021. Even if the statement qualifies as an "adverse action" or can be imputed to other individuals—neither of which is correct—the absence of temporal proximity forecloses Dr. Mitchell's retaliation claim.

**III. Dr. Mitchell has not alleged facts giving rise to a plausible inference of a racially hostile work environment under Section 1981 and Title VII (claim 7).**

A hostile-environment plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult and that it [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Courts apply "demanding harassment standards" when considering such claims. *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005). Title VII's purpose "is not to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight." *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1078 (8th Cir. 2006). "More than a few isolated incidents are required," and the harassment must be so intimidating, offensive, or hostile as to "poison" the "work environment." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999); *see also Nitsche v. Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006) ("To be actionable [under a hostile environment theory], the conduct complained of must be *extreme in nature* and not merely rude or unpleasant.") (emphasis added). In addition, there must be a "causal connection" between the alleged acts of harassment and the plaintiff's race. *Stone v. McGraw Hill Financial, Inc.*, 856 F.3d 1168, 1175 (8th Cir. 2017). A complaint that does not sufficiently allege "severe or pervasive acts" based on race must be dismissed under Rule 12(b)(6). *Jones v. City of St. Louis, Mo.*, 555 F. App'x 641, 642 (8th Cir. 2014).

Dr. Mitchell has merely repackaged four of the discrete incidents of alleged disparate treatment discussed above into a single claim of "harassment." ECF 50, ¶¶ 323-328. In a nutshell, he alleges the following:

- One or more defendants allegedly engaged in "unwelcome spoliation" through (1) the non-creation of additional, unspecified records on the corrective pay actions that UA Little Rock took in late 2017 and early 2018 (ECF 50, ¶ 323) and (2) the non-retention of committee members' disaggregated evaluation scores for any history professors since at least 2016 (ECF 50, ¶ 324).

- In February 2019, administrators allegedly failed to jettison UA Little Rock's established process for deciding internal complaints of discrimination and cede to Dr. Mitchell's demands for a tailor-made procedure. ECF 50, ¶ 325.

- In February 2020, the IRB determined that Dr. Mitchell should have obtained prior approval to undertake a project that involved the handling of information about living persons who were formerly juvenile offenders, and it referred the matter to OHRP. The federal agency, in turn, took no action on the matter. ECF 50, ¶ 326; ECF 50-4, at 8 (Am. Compl. Ex. 29); ECF 53-31.

- The undersigned counsel "disparagingly" described Dr. Mitchell's claims in legal briefs as "seeking special access" (ECF 50, ¶ 215) and told a committee

of the Arkansas General Assembly that Dr. Mitchell's decision to file a law-suit—which came immediately after he was awarded tenure, promoted, and given a raise—was surprising (ECF 50, ¶ 203 & n.3). ECF 50, ¶ 328.

These incidents do not give rise to an inference that Dr. Mitchell was subjected to a racially hostile work environment. For one thing, the amended complaint's allegations do not give rise to a plausible inference that Dr. Mitchell's *race* had something to do with these four incidents. Moreover, the allegations do not remotely meet the law's "extreme" standard for establishing a hostile work environment. *Nitsche*, 446 F.3d at 846.

## IV. Dr. Mitchell's constructive-discharge claim under Section 1981 and Title VII is implausible (claim 9).

Because Dr. Mitchell's new allegations do not establish a claim for a hostile work environment, they necessarily fail to demonstrate a constructive discharge. *Pennsylvania State Police v. Sundners*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more [than an actionable hostile work environment."); *O'Brien v. Department of Agriculture*, 532 F.3d 805, 811 (8th Cir. 20008) (holding that inadequate allegations of a hostile work environment necessitated dismissal of a constructive-discharge claim). "To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing [him] to quit." *Alvarez v. Dez Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010). "In addition, an employee must give her employer a reasonable opportunity to resolve a problem before quitting." *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th Cir. 2012).

66

Even accepting Dr. Mitchell's allegations and related materials as true, they do not state a plausible constructive-discharge claim. *See Dixon v. Ark. Dep't of Human Services*, No. 4:14CV00295 JLH, 2014 WL 5093833, *3 (E.D. Ark. 2014) (dismissing a constructive-discharge complaint under Rule 12(b)(6)). Take the February 2022 performance evaluation, for instance. The fact that Dr. Mitchell initially received an outstanding score of 77.5 from his peers—which Dr. Porter promptly changed to an even more outstanding score of 83.75—does not help Dr. Mitchell satisfy the constructive-discharge standard. If anything, this event shows "an intent to maintain his employment with [UA Little Rock], not force [him] to quit." *Forcello v. County of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010). By comparison, employees who have experienced truly poor evaluations have been unable to proceed under a constructive-discharge theory. *Spears v. Missouri Dept. of Corr. & Human Resources*, 210 F.3d 850, 855 (8th Cir. 2000) (holding that an unfavorable evaluation did not make the plaintiff's working environment intolerable); *Tork v. St. Luke's Hosp.*, 181 F.3d 918, 919 (8th Cir. 1999) (holding that allegedly unjust criticism contained within one oral and two written evaluations was insufficient to establish an "intolerable" workplace under a constructive-discharge theory).

Dr. Mitchell also alleges that an unnamed "administrator"—there are dozens of such persons on campus—speculated that other, undisclosed administrators were "trying to find a way to discharge" him through unspecified means. ECF 50, ¶ 208. Importantly, Dr. Mitchell does not allege that someone with the power to recommend dismissal proceedings against him (*i.e.*, Chancellor, Provost, Dean, or chairperson of

the history department) threatened Dr. Mitchell with termination or implied that his job was in jeopardy. If such persons wanted to pressure Dr. Mitchell to quit, they would have formally initiated the lengthy process for dismissing tenured faculty members or, at the very least, explicitly threatened him with termination.[24] They certainly would not have *increased* his already-outstanding evaluation score. And even if they had made such threats—something that Dr. Mitchell has never alleged—the Eighth Circuit has held that threats of termination, without more, do not "create conditions so intolerable that a reasonable person would resign." *Fischer v. Andersen Sorp.*, 483 F.3d 553, 557 (8th Cir. 2007) (citing *Summit v. S-B Power Tool*, 121 F.3d 416, 421 (8th Cir. 1997)).[25]

It is also noteworthy that Dr. Mitchell accepted another job around the same time that he resigned. *See* note 3, *supra*. The fact that he "apparently began searching for another job while he remained employed" with UA Little Rock "militates against his constructive discharge claim." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 606 F.Supp.2d 427, 447 (S.D.N.Y. 2009). Dr. Mitchell received his annual evaluation in February 2022, yet he continued on the job for four months prior to resigning and accepting a position with the Abraham Lincoln Presidential Library and Museum.

---

[24] Board Policy 405.1, governing dismissal, is available at https://www.uasys.edu/board-policy/405-1-appointments-promotion-tenure-non-reappointment-and-dismissal-of-faculty/.

[25] Dr. Mitchell's vague accusations about a number of other incidents also do not meet the difficult standard for establishing a constructive discharge. These include UA Little Rock's alleged (1) failure to hold administrators accountable for their "bad acts"; (2) failure to "make progress" on the "Black and Brown Committee"; and (3) staff and faculty leaving without resolving "issues of racial discrimination and widespread retaliation." ECF 50, ¶ 353. The amended complaint's description of these incidents is vague, and it does not suggest that any of them were aimed at Dr. Mitchell or intended to get him to quit.

Dr. Mitchell did not suffer a tangible adverse action sufficient to survive Defendants' first motion to dismiss (ECF 9, 10), and he should not be allowed to manufacture one by holding out for a new job and characterizing the situation as a "constructive discharge."

Finally, an employee must give his employer a reasonable opportunity to resolve a problem before quitting. *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th Cir. 2012). The allegations and exhibits to the amended complaint show that UA Little Rock promptly addressed Dr. Mitchell's concerns over his February 2022 evaluation, and he has not alleged that he brought any other serious incidents to a supervisor's attention in recent months. The constructive-discharge claim is implausible on its face.

## V. Dr. Mitchell has not stated a plausible claim under the Fourteenth Amendment's Due Process clause (claim 1).

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and an opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1984). This principle requires "some kind of hearing" prior to the discharge of a tenured professor or public employee who has a constitutionally protected property interest in continued employment. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972). In determining whether an

individual has been deprived of a right to procedural due process,[26] a court must determine (1) whether the individual possesses a protected property interest such that due process protections were applicable and, if so, (2) whether the individual was afforded an appropriate level of process. *Loudermill*, 470 U.S. at 541.

### A.    UA Little Rock's Grievance Policies and Procedures

Dr. Mitchell alleges that, after he allegedly voiced concerns about racism in connection with his February 2019 evaluation, Dean Estes told him that he could use the informal procedures (which would not result in disciplinary action against the respondents) or the formal procedures (which would involve an initial investigation by the human resources department and, potentially, a determination by a hearing committee). ECF 50, ¶¶ 90-92. Dr. Mitchell further alleges that he filed a formal grievance and was "interviewed" on several occasions. ECF 50, ¶ 98. Throughout these events, Dr. Mitchell objected to being placed into an "adversarial, disciplinary-type hearing process." ECF 50, ¶ 100. Therefore, he declined to participate in the hearing. ECF 50, ¶ 128.

The Hearing Committee ultimately determined that the evidence did not support a finding of racial discrimination. ECF 50, ¶ 129; ECF 50-1, at 17-20 (Am. Compl. Ex. 13). The Committee noted that Dr. Mitchell "did not respond to a formal request

---

[26] Dr. Mitchell's amended complaint does not include a claim that a defendant violated a substantive aspect of the Due Process clause. Nor has he alleged facts showing that one of the defendants engaged in conduct that "shocks the conscious." *United States v. Salerno*, 481 U.S. 739, 746 (1987); *see also Strutton v. Meade*, 668 F.3d 549, 667 (8th Cir. 2012) ("Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise."). He has also failed to allege that a defendant interfered with a fundamental right—that is, a right "implicit in the concept of ordered liberty." *Salerno*, 481 U.S. at 747.

to be interviewed by the committee" and that his evaluations were "in line with departmental norms" and indicated "satisfactory progress toward tenure and promotion." *Id*. Dr. Mitchell could have appealed the committee's decision if he had chosen to do so. ECF 53-28.

The foregoing allegations do not state a plausible violation of Dr. Mitchell's procedural due-process rights. For one thing, individuals who complain of discrimination—even tenured professors—do not have a protected liberty or property interest in having their complaints investigated in a certain way (or at all). Although a tenured professor may have a property interest in continued employment, *Roth*, 408 U.S. at 577, this concept has nothing to do with investigating a professor's allegations against others. Dr. Mitchell was not a *respondent* in a grievance proceeding who was faced with the prospect of losing his job, being suspended without pay, or other disciplinary action; he was a *complainant* who sought to subject others to such consequences. Thus, even if UA Little Rock had wholly ignored his grievance (and it did not), there is "no constitutional violation" under the Due Process clause where the government "refuses to investigate" an allegation of wrongdoing against others. *Bernstein v. New York*, 591 F.Supp.2d 448, 461 (S.D.N.Y. 2008); *see also Morrow v. City of Oakland*, No. C 11-0235 LB, 2012 WL 368682, at *14 (N.D. Cal. Feb. 3, 2012) ("Case law suggests that [the plaintiff's] alleged liberty interest—to receive a policy-compliant investigation of his EEO complaint and to have his grievances . . . heard before an impartial body—does not exist under the Fourteenth Amendment.") (collecting cases) (cleaned up).

Moreover, Dr. Mitchell received process. Dr. Mitchell concedes that he was invited to attend a panel hearing, but he refused to participate. ECF 50, ¶ 128. He also had an opportunity to tell his side of the story during several interviews. ECF 50, ¶ 98. He was also encouraged, in "friendly manner," to submit written materials. ECF 50, ¶ 128. These admissions foreclose the viability of a claim under the Due Process clause. *See Interboro Inst., Inc. v. Foley*, 985 F.2d 90, 93 (2d Cir. 1992) (holding that there is no "talismanic significance" to the availability of an oral hearing and that written submissions satisfied due process).

Dr. Mitchell advances inapposite arguments about UA Little Rock's procedures being too "adversarial" in nature. ECF 50, ¶ 100. But the Fourteenth Amendment imposes no requirement that a grievance policy omit procedures (such as a panel hearing) that might be deemed "adversarial" in nature. Indeed, the Title IX regulations, codified at 34 C.F.R. § 106.45, compel institutions of higher education to investigate and respond to complaints of sexual harassment by holding hearings that require the parties to submit to some form of cross-examination by the other side—the essence of an adversarial proceeding. *See Doe v. University of Arkansas*, 974 F.3d 858 (8th Cir. 2020) (holding that a university's procedures were sufficient under the Due Process clause where they at least provided for questioning through an opposing party's written submissions to a hearing panel). Dr. Mitchell's due-process claims regarding UA Little Rock's grievance policy are implausible on their face.

### B. IRB Proceedings

Dr. Mitchell's second due-process claim is based on alleged shortcomings in the IRB's procedures, and it suffers from the same implausibility flaws as above: Dr. Mitchell was not deprived of a constitutionally protected interest, and he received substantial process. As an initial matter, the allegations do not support a deprivation of a protected property interest in continued employment. Dr. Mitchell was never placed in jeopardy of being terminated or suspended without pay. The worst thing that happened to Dr. Mitchell, according to the amended complaint, is that the IRB transmitted its finding of noncompliance to OHRP, and the federal agency ultimately took "no action" in response. ECF 53-31; ECF 50-4, at 8 (Am. Compl. Ex. 29).

Nor has Dr. Mitchell alleged facts that, if proven, would satisfy a stigma-based claim under the Due Process clause. "An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994). Courts have found that accusations of dishonesty, immorality, criminality, child abuse, racism, and mental illness can cause such a stigma. *Id.* Here, the fact that the IRB accused Dr. Mitchell of not seeking prior approval of the juvenile-offender project does not meet this standard. Moreover, the defendant must "publish" the accusations to be liable under this theory, and the alleged act of providing information to other public officials does not qualify as publication. *Hogue v. Clinton*, 791 F.2d 1318, 1322 & n.7 (8th Cir. 1986); *Olson v. City of N. Liberty*, 451 F. Supp. 3d 1010, 1030 (S.D.

Iowa 2020). After all, the Due Process clause should not be construed in a manner that might chill state actors from communicating potentially important information to other public officials. The amended complaint contains no allegations of an actionable publication, particularly given the federal mandate that requires institutions to transmit the information in question. *See* 45 C.F.R. § 46.108(a)(3)(4).

Finally, Dr. Mitchell received all the process that was conceivably due—particularly in a matter that did not involve a termination or lengthy suspension without pay. *Pitts v. Board of Educ. of U.S.D.C. 305, Salina, Kansas*, 869 F.2d 555, 556 (10th Cir. 1989) (holding that lesser disciplinary actions, such as short-term suspensions, do not involve a recognized interest protected by the Due Process clause). According to the amended complaint and exhibits, the IRB proceedings went as follows:

- Dr. Mitchell received notice of the allegations when Crystal Croswell sent him a letter stating that the IRB received a complaint about the class project. *See* ECF 50-2, at 5 (Am. Compl. Ex. 16). "This exercise may have possible implications for a failure to protect human participants," Ms. Croswell wrote. *Id.*

- Dr. Mitchell had an opportunity to be heard. *See* ECF 50, ¶ 137 (alleging that Dr. Mitchell explained his position in answers to written questions); ECF 50-2, at 8 (Am. Compl. Ex. 16) (showing Dr. Mitchell's written "reply" to the IRB's inquiry).

- Dr. Mitchell received a copy of the IRB's written decision. ECF 50, ¶142; ECF 50-2, at 28 (Am. Compl. Ex. 17).

- Dr. Blevins-Knabe provided information to Dr. Mitchell about the appeal process so that he could have yet another opportunity to be heard. ECF 50, ¶ 143; ECF 53-35; ECF 53-36. The process afforded Dr. Mitchell the right to bring a non-participating representative to an appeal hearing to advise him. ECF 53-30, RPP 12.02, § 2.4(D).

- The IRB convened the appeal hearing, which Dr. Mitchell did not attend, and upheld the decision. ECF 50, ¶ 144; ECF 53-37.

These procedures were more than sufficient to protect any constitutionally protected interests that Dr. Mitchell may have possessed. *See Riggins v. Bd. of Regents of Univ. of Nebraska*, 790 F.2d 707, 712 (8th Cir. 1986) (listing minimum procedures required for due process in a termination proceeding). Dr. Mitchell disagrees with the IRB's decision, but his *substantive* disagreement with the outcome does not amount to a violation of *procedural* due process. *Lynch v. McNamara*, 342 F.Supp.2d 59, 68 (D. Conn. 2004) (holding that an officer's substantive disagreement with the outcome of an internal-affairs investigation was "not a claim of a violation of procedural due process"); *Yabar v. Johnson*, No. 1:08cv1296, 2009 WL 10706815 (E.D. Va. Feb. 10, 2009) (holding that a disagreement with the outcome of a proceeding does not implicate due process). Similarly, Dr. Mitchell's contention that UA Little Rock's IRB policy does not "align" with federal regulations (ECF 50, ¶ 139) has nothing to do with whether Dr. Mitchell received minimum procedures prior to a deprivation of a recognized liberty or property interest.

## C.   "Spoliation"

Dr. Mitchell's claim of "spoliation" under the Due Process clause—arising out of the alleged non-retention and non-destruction of certain records—is particularly perplexing. ECF 50, ¶¶ 232-234. An employee is not entitled to a trial-like hearing before a supervisor decides against writing a memorandum regarding a pay issue, avoids taking notes of a meeting, or discards a preliminary "score sheet" after the

scores have been averaged and included in a formal evaluation record. These circumstances do not remotely implicate a property right or liberty interest that must be preceded by procedural safeguards.

## VI.    Dr. Mitchell's conspiracy claim under 42 U.S.C. § 1985 is implausible (claim 3).

Dr. Mitchell's complaint fails to plead plausible facts that suggest the defendants reached an agreement to violate his civil rights.  To state a civil-rights conspiracy claim under Section 1985, the complaint must set forth non-conclusory facts showing that (1) the defendants did "conspire"; (2) for the "purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws"; (3) that one or more conspirators did, or caused to be done, "any act in furtherance of the object of the conspiracy"; and (4) that another person was "injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3); *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 684 (8th Cir. 2012).

The "purpose" element (prong 2) "requires that the plaintiff prove a class-based invidiously discriminatory animus." *Id*. The allegations must be made "with particularity," and they must "specifically demonstrate with material facts that the defendants reached an agreement." *Id.* To satisfy this burden, Dr. Mitchell "must point to at least some facts which would suggest that the defendants reached an understanding to violate [his] rights [under the Reconstruction Era civil-rights laws]." *Bass v. University of Ark. at Pine Bluff*,  No. 5:12-cv000286-KGB, 20014 WL 4630459, at *8 (E.D. Ark. Sept. 14, 2014).

Here, as in *Bass*, Dr. Mitchell has "pleaded only conclusory facts that are not sufficient to plausibly suggest that defendants reached an agreement to violate [his] rights." *Id.* As explained above, the allegations in the complaint and materials of public record point to a series of largely unrelated episodes in which Dr. Mitchell disagreed with various persons on campus for reasons having nothing to do with discriminatory animus. When he complained about a pay disparity in 2017, administrators fixed it; when he complained about a statement in his February 2019 evaluation, the department chair deleted it and replaced it with more assuring language; and when he complained about his sub-score in the "service" category in February 2022, the department chair increased the score to the highest possible level. Moreover, UA Little Rock promoted Dr. Mitchell to associate professor in summer 2021, awarded him tenure, and gave him a raise. The amended complaint's allegations and materials of public record do not tend to show—with particularity and specificity—an agreement among any defendants to violate Dr. Mitchell's civil rights.

## VII.   Dr. Mitchell's neglect claim under Section 1986 is untimely and implausible (claim 4).

Dr. Mitchell's amended complaint includes a new claim under 42 U.S.C. § 1986, which prohibits persons from neglecting to prevent a conspiracy to violate an individual's civil rights under 42 U.S.C. § 1985. Dr. Mitchell primarily seeks relief under Section 1986 against Chancellor Drale, although he says that Dr. Porter and Dean Estes are "joined" in the cause of action. ECF 50, ¶ 287.

## A.      Section 1986's One-Year Statute of Limitations

Unlike other Reconstruction Era civil-rights laws, Section 1986 has its own statute of limitations. Specifically, Dr. Mitchell had one year to file suit after the cause of action accrued. In this case, however, Dr. Mitchell's allegations against Defendants primarily concern their alleged failure to intervene in grievance proceedings that ended in July 2019 (ECF 50-1, at 19—Am. Compl. Ex. 13), in addition to their failure to intervene in IRB proceedings that ended in February 2020. ECF 50-2, at 28 (Am. Compl. Ex. 17). Thus, Dr. Mitchell had until summer 2020 and early 2021, respectively, to assert Section 1986 claims based on these events. Dr. Mitchell's October 2021 complaint does not satisfy Section 1986's one-year limitations provision.

## B.  Insufficient Conspiracy Allegations

The more recent events that might be the subject of Dr. Mitchell's Section 1986 claim consist of the undersigned counsel's presentation to a committee of the General Assembly in January 2022 (ECF 50, ¶¶ 203-204) and his statements to this Court in legal briefs (ECF 50, ¶ 215). Although the factual underpinnings of the relevant paragraph regarding Section 1986 (ECF 50, ¶ 285) are unclear, the amended complaint does not identify any other instances in which an administrator or agent of UA Little Rock has written or spoken publicly about the events giving rise to this lawsuit.

As a factual matter, Dr. Mitchell's hurt feelings over these issues are unfounded. The Court can take judicial notice of the fact that Defendants' first motion-to-dismiss brief (ECF 10) and the statements to the General Assembly (available at the link set forth in footnote 3 of the amended complaint) contained no statement

accusing Dr. Mitchell of "research misconduct." The undersigned counsel's comments to the legislature said nothing about the topic, and the brief merely described the complaint, related exhibits, UA Little Rock's policy, federal regulations, Arkansas laws on the privacy of juvenile offender records, and Dr. Mitchell's failure to seek prior approval from the IRB.

In addition, the undersigned counsel's statements as an advocate cannot, as a matter of law, give rise to cognizable discrimination or retaliation claims against Chancellor Drale, Dr. Porter, and Dean Estes. As discussed above, counsel's statements are privileged; they had nothing to do with Dr. Mitchell's race; and they cannot be imputed to the individual defendants in this action. Nor does the undersigned counsel have a duty under Section 1986 to refrain from characterizing Dr. Mitchell's lawsuit as meritless.

## VIII. Dr. Mitchell's Title VII claims are time-barred or unexhausted, except for his (implausible) claim regarding his outstanding February 2022 performance evaluation (claims 5, 6, 7, 8, and 9).

A person aggrieved under Title VII must present his concerns to the EEOC in a charge of discrimination within 180 days of the employer's unlawful practice. 42 U.S.C. § 2000e-5(e)(1). After the EEOC issues a right-to-sue letter, the plaintiff has 90 days to file a complaint on matters within the scope of the charge. 42 U.S.C. § 2000e-5(f)(1). Any matters not within the scope of the EEOC charge are barred as unexhausted. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847 (8th Cir. 2012).

A.      **Dr. Mitchell has a timeliness problem under the 180-day requirement.**

Dr. Mitchell filed two charges of discrimination—a first charge on May 31, 2019 (ECF 50-1, at 2—Am. Compl. Ex. 1), and a second charge on July 4, 2022 (ECF 50-4, at 21—Am. Compl. Ex. 33). He raised three discrete issues in his May 2019 charge: (1) the pay disparity with Dr. Heil; (2) a confrontation with persons in the payroll department when trying to get an arrears check; and (3) allegedly discriminatory evaluations. ECF 50-1, at 2 (Am. Compl. Ex. 1). He acknowledges that UA Little Rock fixed the pay disparity in early 2018 (ECF 50, ¶ 29), so his wage claim did not fall within the 180-day period. Similarly, Dr. Mitchell's incident with the payroll office allegedly occurred in spring 2018 (ECF 50, ¶ 24), so he should have brought it to the EEOC's attention later in 2018. Dr. Mitchell did raise his February 2019 evaluation with the EEOC within the 180-day period, but he did not do so with the other matters.

Dr. Mitchell's May 2019 charge of discrimination understandably said nothing about the IRB's finding of noncompliance in February 2020, for this incident had not yet occurred. His second EEOC charge on July 4, 2022, mentioned the IRB issue (ECF 50-4, at 21—Am. Compl. Ex. 33), but he filed that charge long after the 180-day deadline. His July 2022 charge also alleged that UA Little Rock's grievance procedures somehow conflict with federal law. But the grievance proceeding concluded in July 2019 (ECF 50, at 18-20), so Dr. Mitchell missed the deadline for raising the issue with the EEOC by a few years.

**B.     Dr. Mitchell has a timeliness problem under the 90-day requirement for matters within the scope of his first EEOC charge.**

Dr. Mitchell also has a timeliness problem under the 90-day requirement to file a lawsuit. The EEOC issued its first right-to-sue letter on April 15, 2021. *See* ECF 50-1, at 3 (Am. Compl. Ex. 3). If three days are added to the calculation for mailing, Dr. Mitchell had ninety days—that is, until July 19, 2021—to file suit on matters within the scope of his first EEOC charge. Dr. Mitchell's claims under Title VII— including any claims over the February 2019 evaluation—are time-barred because he did not file his federal complaint until October 8, 2021, which was nearly three months past his ninety-day deadline to file suit.

Dr. Mitchell may argue that his limitations problem was cured by his act of filing an identical complaint in state court before the deadline expired. But in Case No. 60CV-21-4295, the Pulaski County Circuit Court dismissed the complaint following Dr. Mitchell's notice of non-suit. ECF 53-33; ECF 53-34. And, importantly, Dr. Mitchell never served the complaint or requested the issuance of summonses. ECF 53-8.

These undisputed facts of public record are fatal to Dr. Mitchell's claims under Title VII because courts have consistently held that a voluntary dismissal without prejudice does not toll the statute of limitations; that state savings statutes do not apply to federal claims with limitations periods set by statute; and that an unserved complaint is treated as if it had never been filed. *See, e.g., Zimmerman v. Ark. Dep't of Fin. & Admin.*, 745 Fed. Appx. 666 (8th Cir. 2018) (holding that a plaintiff's Title

81

VII claims were time-barred, notwithstanding the voluntary dismissal of a previous state-court complaint); *Barner v. Thompson/Ctr. Arms. Co.*, 796 F.3d 897, 900 (8th Cir. 2015) (holding that the Arkansas savings statute does not apply to lawsuits brought under Title VII or lawsuits in which the plaintiff did not "commence" an action by completing timely service on the defendant); *McDowell v. Tankinetics, Inc.*, 505 Fed. Appx. 613 (8th Cir. 2013) (holding that a prior state-court suit, which was removed to federal court and dismissed without prejudice, did "not save the instant suit from a dismissal for untimeliness"); *Garfield v. J.C. Nichols Real Estate*, 57 F.3d 662 (8th Cir. 1995) ("Once a dismissal without prejudice is entered and the pending suit is dismissed, it is as if no suit had ever been filed"); *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("The effect of a voluntary dismissal without prejudice . . . is to render the proceedings a nullity and leave the parties as if the action had never been brought."). As Magistrate Judge Ray explained in a decision adopted by this Court, "any dismissal of a Title VII case that occurs, as it did here, more than 90 days after the right to sue letter is issued is, in substance, with prejudice." *Crossley v. Arkansas Flag & Banner*, No. 4:18-CV-00461-JM-JTR, 2018 WL 5304126, at *2 (E.D. Ark. Oct. 5, 2018), *report and rec. adopted*, No. 4:18-CV-00461-JM-JTR, 2018 WL 5303316 (E.D. Ark. Oct. 25, 2018).

## C.    Several of Dr. Mitchell's Title VII claims are unexhausted.

Finally, many of Dr. Mitchell's Title VII claims are unexhausted. Neither charge mentions the undersigned counsel's statements to the legislature, statements

in legal briefs, failure to enter into an MOU, or spoliation. Therefore, Dr. Mitchell cannot predicate a Title VII claim on these unexhausted incidents.

### D.     Summary

Dr. Mitchell perfected a timely EEOC charge and filed a timely Title VII lawsuit with regard to his February 2022 evaluation—the one that went from outstanding to ultra-outstanding after Dr. Mitchell complained. All of the other issues are either unexhausted, barred by the pre-charge (180-day) statute of limitations, or barred by the post-charge (90-day) statute of limitations.[27]

## IX.   Dr. Mitchell's ACRA claims are barred by the statute of limitations (claim 10).

The Arkansas Civil Rights Act has a one-year statute of limitations. Ark. Code Ann. § 16-123-107(c)(4). Therefore, all of the incidents in Dr. Mitchell's complaint prior to October 12, 2020 (*i.e.*, one year before he filed the original complaint in federal court) are time-barred under ACRA.

The bar includes claims based on the following: the pay disparity that UA Little Rock fixed in late 2017 and early 2018; the MOU issue in late 2018; performance evaluations delivered in February 2019 and earlier; the grievance proceedings in 2019; and the IRB's February 2020 decision and referral to OHRP. The only incidents

---

[27] Dr. Mitchell cannot use his timely EEOC charge and lawsuit over his February 2022 performance evaluation to overcome his timeliness problems with regard to other issues. An allegedly negative evaluation in February 2022—following favorable evaluations in February 2021 and February 2020—is a discrete act that cannot render other conduct (such as the February 2019 evaluation or February 2020 IRB decision) actionable under a "continuing violation" theory. *See, e.g.*, *Miller v. New Hampshire Dept. of Corrections*, 296 F.3d 18, 22 (1st Cir. 2002) (holding that a letter of warning and negative performance evaluation were discrete acts had to be acted upon in a timely manner); *Siddiqui v. New York City Health & Hosps. Corp.*, 572 F.Supp.2d 353, 366 (S.D.N.Y. 2008) (evaluations).

that are potentially actionable under ACRA (if sovereign immunity were not a separate bar, as discussed below) are (1) the undersigned counsel's statement to a legislative committee in January 2022; (2) the outstanding performance evaluation that Dr. Mitchell received in February 2022; and (3) the non-creation (or non-retention) of evaluation "score sheets" in February 2022. But these three incidents do not plausibly give rise to an inference of race discrimination or retaliation for the reasons discussed above. Nor are they adverse actions under ACRA. *See, e.g., James v. George's, Inc.*, 646 S.W.3d 238, 242 (Ark. App. 2022) (applying the *McDonnell Douglas* standard to ACRA claims).

## X.    Title VII and ACRA do not authorize individual-capacity suits in the employment context (claims 5, 6, 7, 8, 9, and 10).

Title VII authorizes suits only against "employers," and courts have consistently held that Title VII does not authorize suits against individuals. *See, e.g.*, *Carter v. Mil. Dep't of Arkansas*, No. 4:18-CV-00444-KGB, 2019 WL 4741651, at *4 (E.D. Ark. Sept. 27, 2019) (collecting cases). Likewise, after the Arkansas General Assembly enacted Act 191 of 2017, it is now clear that claims of workplace retaliation and interference with civil rights under ACRA are not permitted against individuals. *Steinbuch v. Univ. of Arkansas*, 2019 Ark. 356, 16, 589 S.W.3d 350, 360 (2019). Therefore, Dr. Mitchell's claims under Title VII and ACRA are barred.

## XI.   Dr. Mitchell's ACRA claim against a public institution of higher education is barred by sovereign immunity (claim 10).

To the extent that Dr. Mitchell has attempted to sue an institution of higher education, his claim under ACRA is still barred by sovereign immunity. *See* U.S.

Const., amend. 11; Ark. Const., art. V, § 20; Ark. Code Ann. § 16-123-104 (stating that "nothing in ACRA shall be construed to waive the sovereign immunity of the State of Arkansas"); *Brazil v. Arkansas Dep't of Human Services*, No. 5:19CV00087, 2020 WL 5733181, at *2 (E.D. Ark. Sept. 12, 2020) (Moody, J.) (dismissing an ACRA claim against a state entity pursuant to the doctrine of sovereign immunity); *Mullen v. Arkansas Game & Fish Comm'n*, No. 4:17-cv-00416-SWW, 2017 WL 5162810, at *1 (same); *Cross v. Arkansas Livestock & Poultry Comm'n*, 943 S.W.2d 230, 232 (Ark. 1997).

## XII.   The individual-capacity defendants have qualified immunity and statutory immunity.

### A.   Qualified Immunity

Qualified immunity from personal liability "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lyons v. Vaught*, 875 F.3d 1168, 1171 (8th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). It "protects all but the plainly incompetent or those who knowingly violate the law." *Id*. Because qualified immunity is immunity from suit—rather than a mere defense to liability—it must be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Each official is "entitled to a through determination of [her claim] of qualified immunity if that immunity is to mean anything at all." *Payne v. Britten*, 749 F.3d 697, 701 (8th Cir. 2015).

When addressing qualified immunity at the motion-to-dismiss stage, a court considers "[1] whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and [2] whether the right was clearly established at the

time of the alleged infraction." *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). Courts have discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first "in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

At the first step of the qualified-immunity analysis, a complaint alleging workplace discrimination or retaliation is implausible on its face if it fails to establish that the defendant's various actions were "serious enough to amount to adverse employment actions." *Shockency v. Ramsey Cty.*, 493 F.3d 941, 950 (8th Cir. 2007) (holding that the defendant was entitled to qualified immunity where he allegedly criticized the plaintiff in writing and placed unwarranted reprimands in his file, ordered him to record how he spent his time, and required him to stay in the office except for lunch; such incidents were not adverse actions); *Johnson v. Viskase*, No. 3:10CV00304 SWW, 2011 WL 13195907, at *2 (E.D. Ark. Oct. 27, 2011), *aff'd*, 457 F. App'x 594 (8th Cir. 2012) (dismissing a complaint that contained insufficient allegations of adverse action). In addition, a claim of disparate treatment, harassment, or retaliation is implausible if the allegations fail to give rise to an inference of discriminatory or retaliatory animus on the part of the particular defendant. In *Hager*, for example, the Eighth Circuit held that the district court reversibly erred in denying a defendant's motion to dismiss under the doctrine of qualified immunity because the complaint's allegations did not give rise to a plausible inference of an equal-protection violation under 42 U.S.C. § 1983. The complaint contained no direct evidence of discrimination,

and its "conclusory" allegation that "similarly situated" employees were treated differently was insufficient under the *Twombly* standard. *Hager*, 735 F.3d at 1015. The court approvingly cited *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190-91 (4th Cir. 2010), which held that a plaintiff's allegation that he "was treated differently as a result of his race than whites"—even where the plaintiff identified an alleged comparator by name—was insufficient under *Twombly* because there were no factual allegations explaining how the comparator was similarly situated in relevant respects.

At the second step of the qualified-immunity analysis, the Supreme Court has "repeatedly warned" that "clearly established law should not be defined at a high level of generality" but must be "particularized to the facts of the case." *Lyons*, 875 F.3d at 1172. Absent controlling authority from the U.S. Supreme Court or the Eighth Circuit, the plaintiff must show "a robust consensus of cases of persuasive authority." *De La Rosa v. White*, 852 F.3d 740, 746 (8th Cir. 2017). Although there does not have to be a case directly on point for a right to be clearly established, existing precedent must have placed the question "beyond debate" at the time the defendant acted. *Lyons*, 875 F.3d at 1172.

The amended complaint in this case is devoid of non-conclusory allegations giving rise to an inference that the individual defendants intentionally discriminated against Dr. Mitchell because of his race or national origin, subjected him to a racially hostile work environment, caused him to sustain an adverse action, or deprived him of procedural due-process rights. On the face of the complaint, Dr. Porter, Dean Estes,

Chancellor Drale, and Dr. Blevins-Knabe did not violate Dr. Mitchell's clearly established constitutional or statutory rights. Therefore, they are entitled to qualified immunity from Dr. Mitchell's claims under 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1986. Each individual deserves separate consideration.

**1. Jess Porter is entitled to qualified immunity.**

**a.** With regard to the pay-disparity issue, Dr. Mitchell does not allege that Dr. Porter chaired the history department at the time he became a full-time faculty member in summer 2015. ECF 50, ¶ 50-51 (alleging that the chair changed from Dr. Clea Hupp to Dr. Porter sometime between spring 2016 and spring 2017). Nor does Dr. Mitchell allege that, generally speaking, the history department's chairperson sets faculty members' salaries. Thus, Dr. Porter could not have had any role in the pay-setting decision that created the disparity with Dr. Heil.

The amended complaint says that Dr. Mitchell first approached Dr. Porter about the pay disparity in fall 2017, and Dr. Porter asked Dr. Mitchell to prepare a written summary of his concerns so that Dr. Porter could pass them along to senior administrators. ECF 50-1, at 6 (Am. Compl. Ex. 3). There are no allegations that Dr. Porter failed to report Dr. Mitchell's concerns. In fact, a month after Dr. Mitchell conferred with Dr. Porter on the issue, Dr. Mitchell received word that then-Provost Velmer Burton (a non-party) decided to equalize the salaries of Dr. Mitchell and Dr. Heil by giving Dr. Mitchell a $2,128 pay raise. ECF 50-1, at 5 (Am. Compl. Ex. 4). Furthermore, on March 8, 2018, then-Associate Vice Chancellor Drale sent a message

to the payroll department authorizing the payment of $4,728 to Dr. Mitchell "to pro-
vide the salary deferential back to the date of hire as a lump sum." ECF 50-1, at 6
(Am. Compl. Ex 5).

Dr. Mitchell does not allege that he ever approached Dr. Porter (or anyone else)
with allegations that the arrears payment was miscalculated or that his pay re-
mained unequal with Dr. Heil. And for good reason: publicly available payroll records,
which can be the subject of judicial notice, indisputably show that there was no mis-
calculation or continuing disparity. *See* ECF 51-1 through ECF 51-17. The allegations
in the complaint do not support an inference that Dr. Porter took any adverse actions
with respect to Dr. Mitchell's pay or that his conduct in connection with the compen-
sation issue was infected with discriminatory or retaliatory animus.

**b.** On the issue of Dr. Mitchell's performance evaluations, Dr. Mitchell con-
cedes that the APT Committee—not the department chair—was charged with pre-
paring quantitative scores based on faculty members' self-assessments. ECF 50, ¶ 75
(alleging that he sent a self-assessment, immediately before the February 2019 eval-
uation, to the APT Committee); ECF 50, ¶ 87 (alleging that the "APT Committee
participates in faculty evaluations"). The amended complaint's allegations are con-
sistent with the history department's bylaws—a collection of rules mentioned in (and
embraced by) the complaint—which charge the APT Committee with the task of re-
viewing each faculty member's self-assessment and generating a score in the areas of
teaching, scholarship, and service. ECF 51-18, at 12-15, 20-23, 32. The department
chair may only revise the APT Committee's ratings pursuant to an appeal. *Id*. at 15.

Dr. Mitchell does not allege that he ever received a less-than-satisfactory score from the APT Committee. Moreover, Dr. Porter's comments were positive; there is not a single negative sentence in the evaluations. ECF 51-19 through ECF 51-27.

Dr. Mitchell nevertheless voiced his dissatisfaction on two occasions, and Dr. Porter attempted to appease Dr. Mitchell both times. The first time came in February 2019, after the APT Committee gave Dr. Mitchell a total score of 147.4. Dr. Mitchell described the score as falling within the "lowest segment of the 'Good Category.'" ECF 50-1, at 10 (Am. Compl. Ex. 9); *see also* ECF 50-1, at 9 (Am. Compl. Ex. 8) (Dr. Mitchell's handwritten notes expressing disagreement "w/ APT Committee's quantitative evaluation."). Although some faculty members might be content with a "good" score, Dr. Mitchell was not. He was also concerned with a single statement in the evaluation, which reminded Dr. Mitchell about the history department's pre-tenure publication requirements and recommended that Dr. Mitchell "make clearer" how his publications satisfied the requirements. ECF 50-1, at 8 (Am. Compl. Ex. 7). When Dr. Mitchell met with Dr Porter about the issue, Dr. Porter revised the evaluation to state that Dr. Mitchell "achieved the requisite number of publications for promotion and tenure as defined in the department bylaws." ECF 50-1, at 9 (Am. Compl. Ex. 8).

Dr. Mitchell was satisfied with his evaluations in February 2020 and February 2021. In February 2022, however, Dr. Mitchell voiced his disagreement with the APT Committee's sub-score in the area of service. ECF 50, ¶192 (complaining that he got a "good" rating instead of an "outstanding" rating in service). A few days later, Dr. Mitchell met with Dr. Porter about the matter. ECF 50, ¶ 192; ECF 50-4, at 11 (Am.

Compl. Ex. 31). Dr. Porter changed Dr. Mitchell's score in the area of service to 30, which was "the highest possible score." ECF 50-4, at 11-12 (Am. Compl. Ex. 31).

The amended complaint's allegations do not support an inference that Dr. Porter took any adverse actions with respect to Dr. Mitchell's evaluations. Nor do they plausibly suggest that Dr. Porter's conduct in connection with the evaluations—such as his beneficial changes to the February 2019 and February 2022 evaluations in response to Dr. Mitchell's complaints—was infected with discriminatory or retaliatory animus.

**c.** Dr. Mitchell also alleges that Dr. Porter refused to "process, approve, or promote an MOU for Dr. Mitchell's public history research and scholarship"—an agreement between employer and employee that would apparently have allowed Dr. Mitchell to get credit for digital projects in lieu of traditional publications. ECF ¶ 50, ¶ 73; *id*. at ¶¶ 71-72. But there are no allegations that Dr. Porter has ever "promoted" an MOU for other faculty members seeking to bypass the history department's traditional publication requirements. Moreover, Dr. Mitchell admits that he got tenure (ECF 50, ¶ 16), and he does not allege that Dr. Porter withheld his support during the tenure process. Nor does Dr. Mitchell contend that his digital projects have gone without praise or consideration from Dr. Porter and the APT Committee. Nor can he make such an assertion in the future. *See* ECF 51-20 (February 2016 evaluation: "He has a number of ongoing collaborative digital history projects."); ECF 51-21 (February 2017 evaluation: "[H]e continues to work on the creation of databases regarding the migration of free blacks."). The allegations and materials embraced by the complaint

91

do not support an inference that not getting an MOU was an adverse action or that Dr. Porter's conduct in connection with the MOU issue was fueled by discriminatory or retaliatory animus.

**d.**   On the issue of UA Little Rock's procedures for handling internal complaints of discrimination, there are no allegations that Dr. Porter wrote UA Little Rock's grievance policy or was charged with administering it on behalf of the human-resources department. In fact, Dr. Porter's sole role in the grievance proceedings was that of a respondent—a person *accused* of intentional discrimination. ECF 50-1, at 19 (Am. Compl. Ex. 13). The allegations do not support an inference that Dr. Porter took any adverse actions with respect to the grievance proceedings or that his conduct in connection with the grievance was infected with discriminatory or retaliatory animus.

**e.**   Dr. Mitchell alleges that Dr. Porter failed to gather and keep preliminary "score sheets" showing the APT Committee's ratings of faculty members. ECF 50, ¶ 199. But Dr. Mitchell does not dispute the fact that every formal evaluation contained an entry showing the APT Committee's average score in the areas of teaching, scholarship, and service. *See* ECF 50-1, at 9 (Am. Compl. Ex. 8); ECF 50-4 (Am. Compl. Ex. 31); *see also* ECF 51-19 through ECF 27. Dr. Mitchell also does not allege that the history department has traditionally kept "score sheets" for other faculty members. Nor does he allege that a "score sheet" would have provided useful information, such as a breakdown of how each committee member rated each faculty member. Indeed, in the FOIA materials that Dr. Mitchell referenced in paragraph 104 of his

amended complaint, the lone "score sheet" contained no such breakdown. ECF 51-29 (showing sores of "10,10, 10" for Dr. Mitchell in each category without identifying a committee member's name). Since a preliminary document of this nature would not have had any lasting utility after the creation of a formal evaluation record, it is not apparent that it qualifies as a "personnel or employment record" that must be kept under 29 C.F.R. § 1602.49—a regulation that confers no private right of action in any event. The allegations do not support an inference that Dr. Porter's alleged conduct in connection with the APT Committee's "score sheets" was motivated by discriminatory or retaliatory animus. Nor do they give rise to an inference that Dr. Mitchell suffered a material disadvantage in terms and conditions of his employment due to the absence of "score sheets."

    **f.**  On the issue of the IRB proceedings, the amended complaint does not allege that Dr. Porter filed a complaint of research misconduct against Dr. Mitchell, severed as a member of the IRB, lobbied the IRB to make a finding of noncompliance, or otherwise participated in the proceedings. Dr. Mitchell also does not dispute that Dr. Porter had no power to influence the IRB, which must carry out its duties "independently of the Institution," free of outsiders' influence. ECF 53-30, RPP Policy 1.06, § 2.5. At most, Dr. Mitchell alleges that Dr. Porter told Dr. Mitchell "that he could not do or communicate anything further per Blevins." ECF 50, ¶ 147; *see also* ECF 50-3, at 5 (Am. Compl. Ex. 19) (Porter to Mitchell: "I spoke with Dr. Blevins-Knabe late this afternoon in an effort to ascertain more details about the IRB appeal process. Dr. Blevins-Knabe informed me that any questions about the IRB appeal process

needed to come via direct communication from you. She did not want to risk miscommunication by going through a third-party (me)."). The allegations do not support an inference that Dr. Porter took any adverse actions against Dr. Mitchell with respect to the IRB proceedings or that his minimal conduct in connection with the IRB issue was infused with discriminatory or retaliatory animus. Dr. Porter deserves qualified immunity on this issue.

**g.**  Finally, on the issue of public statements about research misconduct, Dr. Mitchell does not allege that Dr. Porter made any specific statements about the topic, when they were made, or to whom he made them. He merely alleged that *somebody else*—namely, the undersigned counsel—described Dr. Mitchell "as seeking special access or treatment" in "court pleadings" (ECF 50, ¶215) and expressed surprise to a legislative committee that Dr. Mitchell would file a lawsuit immediately after obtaining tenure (ECF 50, ¶ 204 & n.3). The allegations do not support an inference that *Dr. Porter* took an adverse action against Dr. Mitchell or that his conduct in connection with the IRB issue was motivated by discriminatory or retaliatory animus.

### 2. Sarah Beth Estes is entitled to qualified immunity.

**a.**  Dr. Mitchell does not allege that Dean Estes had anything to do with his pay disparity with Dr. Heil. And for good reason: Dean Estes was not named to the position of interim dean until June 2018,[28] which was *after* UA Little Rock equalized Dr. Mitchell's salary with Dr. Heil's salary and made arrears payments. Nor does Dr.

---

[28] *See* Press Release, Estes Named New Interim Dan of College of Arts, Letters, and Sciences (June 22, 2018), *available at* https://ualr.edu/news/2018/06/22/estes-named-new-interim-dean-college-arts-letters-sciences/.

Mitchell allege that Dean Estes evaluated Dr. Mitchell's performance or rejected the idea of entering into an MOU.

**b.** Dean Estes figures most prominently in Dr. Mitchell's allegations regarding his internal complaint of discrimination following his February 2019 evaluation. Dr. Mitchell allegedly asked Dean Estes if she could "facilitate a meeting with the university's Provost, Chancellor, and stakeholder in the recruitment and retention of minority faculty." ECF 50, ¶ 89. In response, Dean Estes allegedly told Dr. Mitchell that he could report his discrimination concerns using the "informal" or "formal" procedures available under UA Little Rock's grievance policy. ECF 50, ¶ 90-92. She allegedly said that UA Little Rock's regular investigatory procedure—not an "ad hoc committee" was the "appropriate venue" for Dr. Mitchell's internal complaint. ECF 50, ¶127. Dean Estes was not an investigator or human-resources official charged with administering the grievance policy, but she told Dr. Mitchell that Cynthia Mayhan (a non-party) in the human-resources department would be his "point of contact." ECF 50, ¶ 95. The allegations do not support an inference that Dean Estes took any adverse actions against Dr. Mitchell with respect to the grievance proceedings or that her conduct in this area was infected with discriminatory or retaliatory animus.

**c.** Dr. Mitchell also alleges that Dean Estes also failed to retain the same APT Committee "score sheets" that Dr. Porter allegedly discarded. As with Dr. Porter, Dr. Mitchell does not explain why Dean Estes might have believed that a preliminary record of this nature would have contained useful information that needed to be kept. The allegations do not support an inference that Dean Estes took any adverse actions

against Dr. Mitchell or that her alleged conduct in connection with the APT Committee's "score sheets" was tainted by discriminatory or retaliatory animus.

**d.** Dr. Mitchell also alleges that, like Dr. Porter, Dean Estes declined to violate the IRB policies and procedures by intervening in the IRB's investigation. ECF 50, ¶151. As with Dr. Porter, Dr. Mitchell does not allege that Dean Estates had any oversight responsibilities over the IRB, was a member of the audit team or board, or played any role in the board's finding of noncompliance.

**e.** Finally, Dr. Mitchell implies that the undersigned counsel's statements in court submissions and at a legislative committee meeting should be imputed to Dr. Estes. ECF 50, ¶ 243. Dr. Mitchell does not give any other indication as to when or how Dean Estes might have "maintained" UA Little Rock's "official position" that Dr. Mitchell committed "a serious act of research misconduct." *Id.* Of course, the undersigned counsel's comments to the legislative committee contained no such statement. ECF 50, at 48, n.3. Nor can counsel's privileged comments be imputed to Dean Estes, so she should receive qualified immunity.

### 3. Christina Drale is entitled to qualified immunity.

**a.** Dr. Drale became interim Provost in October 2018 and Chancellor on September 12, 2019. *See* Helaine Williams, "Christina Suzanne Drale Brings Calm Demeanor as New UALR Chancellor," *Arkansas Democrat-Gazette* (July 5, 2020), *available at* https://www.arkansasonline.com/news/2020/jul/05/christina-suzanne-drale/. Before that, she served as associate vice chancellor for academic affairs under Velmer Burton, the former provost. Therefore, Dr. Mitchell understandably does not allege

that Chancellor Drale played any role in establishing Dr. Mitchell's starting salary in summer 2015.

Her only alleged role in the compensation matter was communicating to the payroll department Provost Burton's decision to compensate Dr. Mitchell with $4,728 in backpay so as to "provide the salary differential back to the date of hire as a lump sum." ECF 50, ¶ 32; ECF 50-1 at 6 (Am. Compl. Ex. 5); *see also* ECF 51-1, 3 (payroll records showing arrears payments to Dr. Mitchell). Dr. Mitchell does not allege that, after he received the back wages, he presented additional information to Chancellor Drale regarding a miscalculation or an ongoing pay disparity with Dr. Heil. (As explained above, the public records show that there was no miscalculation or continuing disparity).

Dr. Mitchell implies there was something sinister about Dr. Drale's message to the payroll department: she allegedly refused to generate even more records on the matter. ECF 50, ¶ 269. The amended complaint uses the word "spoliation" to describe Dr. Drale's statement that that her communication would "be the only item [she could] provide" after Provost Burton declined to write a lengthier memorandum. ECF 50-1, at 6. Dr. Mitchell does not say what additional records Dr. Drale (as opposed to Provost Burton) should have created or whether UA Little Rock created such records with regard to similarly situated employees of other races. In the final analysis, the allegations do not support an inference that Dr. Drale took any adverse actions with respect to Dr. Mitchell's compensation or that her conduct in cobnection with correcting Dr. Mitchell's pay was infected with discriminatory or retaliatory animus.

**b.** Dr. Mitchell also implies, in a conclusory fashion, that Dr. Drale "abused the discrimination complaint process" when he filed an internal grievance in February 2019. ECF 50, ¶ 369. He does not, however, say anything about her involvement in the grievance proceedings other than her failure to hold a special meeting among "stakeholders" in lieu of using the institution's regular investigatory procedures. ECF 50, ¶ 89. A human-resources official allegedly told Dr. Mitchell that he could contact Dr. Drale about his dissatisfaction with the hearing committee's finding of nondiscrimination (ECF 50, ¶ 131), but he does not allege that he ever pursued the matter further. The allegations do not support an inference that Dr. Drale took material adverse actions against Dr. Mitchell with respect to the grievance proceedings or that her conduct in connection with Dr. Mitchell's internal complaint of discrimination was infected with discriminatory or retaliatory animus. She is therefore entitled to qualified immunity.

**c.** Finally, Dr. Mitchell suggests that Chancellor Drale should have intervened in the IRB proceedings because she is allegedly "responsible for oversight of UALR's IRB functions." ECF 50, ¶ 189. But the chancellor's oversight responsibilities can only go so far. Although the chancellor, serving as the "institutional officer," might appoint the IRB chairperson (ECF 53-30, RPP Policy 1.05, § 2.2), there is no institutional policy that allows the chancellor to *overrule* the IRB's findings of noncompliance. The amended complaint does not allege anything to the contrary. In fact, federal law says that an institution's IRB—not a high-ranking administrator on a campus—has the sole authority to review and approve covered research activities. 45 C.F.R. §

46.109(a); *see also* 45 C.F.R. § 46.112 (providing that university officials may not approve covered research if it has not been approved by an IRB). What is more, UA Little Rock's policy prohibits anyone "from within or outside the Institution" (including the chancellor) from attempting to influence the IRB. ECF 53-30, RPP Policy 1.06, § 2.5. It also establishes an appeal procedure that does not involve the chancellor. ECF 53-30, RPP Policy 3.14. The chancellor's role is limited to authorizing the IRB to "*independently* review and approve all human participate research supported by the faculty, students, staff, or other representatives of UA Little Rock." ECF 53-30, RPP Policy 1.06, § 2.1 (emphasis added).

The amended complaint's allegations and materials of public record do not support an inference that Chancellor Drale took any adverse actions against Dr. Mitchell with respect to the IRB issue. Nor do they plausibly allege that Chancellor Drale's non-intervention was motivated by discriminatory or retaliatory animus, as opposed to a desire to follow federal regulations and UA Little Rock's own policy.

### 4. Belinda Blevins-Knabe is entitled to qualified immunity.

Dr. Mitchell does not allege that Dr. Blevins-Knabe had anything to do with the pay disparity, his failure to get an MOU on digital projects, alleged spoliation, evaluations, or the internal grievance following his February 2019 evaluation. Dr. Blevins-Knabe's sole role in this case is that of Chair of the Institutional Review Board. ECF 50, ¶ 136. In this regard, she does not act alone. The IRB Chair conducts meetings of the IRB, which has "at least ten members." ECF 53-30, RPP Policy 1.05, § 2.6, RPP Policy 2.01, § 2.1.

Dr. Mitchell's complaint alleges that, on November 21, 2019, a graduate assistant raised privacy-related concerns about a project involving the transcription of records with information about nonconsenting, living persons. ECF 50-2, at 1 (Am. Compl. Ex. 15). "[T]hese are juvenile prison records," the student wrote, and they included "addresses, parents' names, and other information with which it would be exceptionally easy to locate these people." *Id*. Someone "with knowledge of the legal side" told the student that "those types of records are always sealed, never enter into the public domain, and that we should not have had access to the entire unredacted document." *Id*.

Soon thereafter, Crystal Croswell (a non-party) sent notice of a potential violation to Dr. Mitchell; instructed him to take possession of the records and store them securely; and told him to respond in writing to Dr. Blevins-Knabe. ECF 50-2, at 5 (Am. Compl. Ex. 16). Dr. Blevins-Knabe subsequently sent a list of questions to Dr. Mitchell on November 26, 2019. ECF 50-2, at 7 (Am. Compl., Ex. 16). Dr. Mitchell responded with a lengthy email explaining his point of view. ECF 50-2, at 8-9 (Am. Compl., Ex. 16).

On December 11, 2019, Dr. Blevins-Knabe notified Dr. Mitchell that an "audit team," consisting of Dr. Susan Hoffpauir of the Clinton School of Public Service and Dr. James Golden of the UA Little Rock School of Criminal Justice, had been appointed. ECF 50-2, at 22 (Am. Compl. Ex. 16). The audit team made recommendations to the IRB on January 30, 2020, and the IRB voted to approve the audit team's findings. ECF 50-2, at 29 (Am. Compl. Ex. 17). Pursuant to UA Little Rock's policy, Dr.

Belinda Blevins-Knabe transmitted the findings of noncompliance to the U.S. Department of Human Services Office of Human Research Protections. ECF 50-3, at 1-3 (Am. Compl. Ex. 18).

Dr. Blevins-Knabe explained the IRB appeal process to Dr. Mitchell (ECF 31-35), and she reminded him about the appeal date (ECF 31-36). Dr. Mitchell refused to appear at the appeal hearing, but the IRB still reviewed relevant records. ECF 31-37. The IRB ultimately voted to affirm its original determination. *Id*. The IRB told Dr. Mitchell that he could contact OHRP with "further issues." *Id*. Thereafter, OHRP determined that the juvenile-offender project did not meet the definition of "research" under the federal definition and that the subjects of the records could not be readily identified; however, it also noted that UA Little Rock "may implement policies and procedures for research that go beyond the requirements of HHS regulations." ECF 50-4, at 8 (Am. Compl. Ex. 29); *see also* ECF 51-31.

Dr. Mitchell does not allege that Dr. Blevins-Knabe referred Dr. Mitchell for termination proceedings or that the IRB had the power to make such a referral. Nor can Dr. Mitchell contend that the IRB findings were an impediment to his advancement at UA Little Rock given that he was promoted and awarded tenure in spring 2021 ECF 50, ¶ 16.

Importantly, Dr. Mitchell does not allege that, during Dr. Blevins-Knabe's time as Chair of the IRB, she has ever been apprised of other projects involving the potentially private information of nonconsenting, living persons. In other words, the

amended complaint does not allege that the IRB, under Dr. Blevins-Knabe's leader-ship, has taken a different view of similar projects after becoming aware of them. *Elam*, 608 F.3d at 881 (holding that there was discrimination where decisionmaker was unaware of incidents involving others). The allegations do not support an infer-ence that Dr. Blevins-Knabe took any adverse actions against Dr. Mitchell or that her conduct in connection with the IRB proceedings was infected with discriminatory or retaliatory animus.

### B.  Statutory Immunity

Dr. Mitchell's ACRA claim against these individual defendants is similarly barred by statutory immunity under Ark. Code Ann. § 19-10-305(a). The statute pro-vides that state employees are "immune from suit, except to the extent they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment." The statutory doctrine is somewhat like qualified immunity, except that the plaintiff must establish "malice." *Simons v. Marshall*, 369 Ark. 447, 452, 255 S.W.3d 838, 842 (2007); *Gordon v. Bd. of Trustees of Univ. of Ark.*, 168 F.3d 1148, 1160 (E.D. Ark. 2016).

Here, as in *Gordon*, Dr. Mitchell has not alleged any non-conclusory facts sug-gesting that the individual defendants were acting other than in the scope of their employment by UA Little Rock. "Nor does the complaint allege that they were covered

by liability insurance or facts allowing the Court to infer that their acts were malicious." *Id.* Therefore, the ACRA claims against the individual defendants are barred by statutory immunity.

## XIII. Dr. Mitchell's claim for injunctive relief is moot and impermissibly vague.

In this amended complaint, Dr. Mitchell asks this Court to enjoin Defendants from discriminating against him and violating his constitutional rights. ECF 50, at 93. But "an injunction which does little or nothing more than order the defendants to obey the law is not specific enough." *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016). Moreover, Dr. Mitchell has now resigned and accepted a job in Illinois, so these equitable remedies would serve no purpose.

Dr. Mitchell has also requested that the Court order UA Little Rock to "withdraw" its referral to OHRP, but this request is moot because the federal agency has already closed the matter after finding that Dr. Mitchell's project was not "research" (as defined by the federal regulations). ECF 53-31. Therefore, Dr. Mitchell's official-capacity claims against Chancellor Drale are moot. *Forbes v. Arkansas Educ. Television Comm. Network*, 982 F.2d 289 (8th Cir. 1992) (holding that a claim for equitable relief was moot because it was "no longer possible for the grant or denial" of the request for injunctive relief to "have any meaning").

## XIV. The amended complaint violates Rule 8's requirement of a short and plain statement.

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," and its language must be "simple, concise, and

103

direct." Fed. R. Civ. P. 8(a), (d)(1); *see generally* Charles A. Wright et al., 5 *Federal Practice & Procedure* § 1217 (4th ed. Oct. 2021 Update). Complaints that are "rambling and needlessly long and confusing" violate Rule 8. *McAninch v. Wintermute*, 491 F.3d 759, 766 (8th Cir. 2007). In *McAninch*, the plaintiff sought leave to file an amended complaint to assert additional claims and allegations of fact against a defendant. The district court, however, found that the amended complaint contained "lengthy, irrelevant, and largely incomprehensible factual allegations" and "discussions of case law supposedly supporting claims." *Id.* at 766. Therefore, the district court ruled that the proposed amendment would be "futile and improper." *Id.* The Eighth Circuit affirmed, noting that the amendment could have resulted in a delay in the proceedings.

Similarly, in this case, Dr. Mitchell's amended complaint consists of 96 pages (not counting the 34 exhibits spanning 103 pages) and 371 paragraphs (not including the prayer for relief). It is filled with lengthy and irrelevant allegations, in addition to hyperbolic references to "plantation and slavery culture" (ECF 50, ¶¶ 49, 328) and an "expectation [that Dr. Mitchell will] work indefinitely for free." (ECF 40, ¶ 49). The amended complaint contains no references to direct evidence of discriminatory animus or made allegations of fact about how Defendants have treated similarly situated individuals in the context of MOUs, grievance proceedings, or anything else. All the while, he has omitted key facts (such as his acceptance of a new job) and failed to acknowledge that other facts (such as wage records) belie the notion of a post-2017 pay disparity.

Instead of filling critical gaps, Dr. Mitchell has devoted countless pages to a discussion of state criminal laws on record tampering, human-resources audits, federal regulations on research integrity officers, citations to numerous cases, and other impertinent information. He has also used this litigation to fume about a rectified pay disparity, performance evaluations that Dr. Porter amended in his favor, and other issues that UA Little Rock has already addressed. The operative complaint even contains a line-by-line colloquy—a play-like script—of Dr. Mitchell's interactions with individuals in the payroll department many years ago, where he refused to leave upon request, got into a confrontation with a clerk, and ultimately "received a check without further incident." ECF 50, ¶¶ 24-25.

Dr. Mitchell's "repetitive, argumentative, rambling, and conclusory" allegations constitute a "gross failure" to comply with Rule 8. *Gieselman v. County of Jefferson*, No. 4:08CV00425 AGF, 2008 WL 2357007 (E.D. Mo. 2008). This gross failure has persisted through two iterations of the operative pleading, and time for dismissal has come. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should dismiss the amended complaint with prejudice.

Respectfully submitted,

UNIVERSITY OF ARKANSAS SYSTEM
OFFICE OF THE GENERAL COUNSEL

David A. Curran (Ark. Bar No. 2003031)
Associate General Counsel
University of Arkansas System
2404 N. University Ave.
Little Rock, AR  72207-3608
(501) 686-2536
dcurran@uasys.edu

And

Mindy D. Pipkin (Ark. Bar No. 2004067)
Associate General Counsel
University of Arkansas System
2801 S. University Ave., SSC Suite 413
Little Rock, AR  72204-1099
(501) 916-5699
mdpipkin@ualr.edu

*Attorneys for Defendants*